**PHILLIPS PETROLEUM COMPANY**

v.

**W. W. McILROY et al.**

**Civ. A. No. 2311.**

United States District Court
N. D. Texas,
Amarillo Division.

Sept. 30, 1959.

C. J. Roberts, Boyd Taylor, George W. Terry, Amarillo, Tex., for plaintiff, Phillips Petroleum Co.

Simpson, Clayton & Fullingim, Selden Simpson, Amarillo, Tex., for de-fendants Burnett Corp., Helen Noble Burnett and B. O. Cornelius.

Adkins, Folley, McConnell & Hankins, A. J. Folley, Amarillo, Tex., for defend-ant W. F. Simms.

Embry, Crowe, Tolbert, Boxley & Johnson, Wm. J. Holloway, Jr., Okla-homa City, Okl., for defendants Harris, Askew, Sharp, Howard and Toklan Oil Corp.

Underwood, Wilson, Sutton, Heare & Boyce, Clayton Heare, Amarillo, Tex., for defendants W. W. McIlroy, A. E. Herrmann Corp., G. C. Herrmann Co. and Royalties Management Corp.

Cochran, Dudley, Fowler, Rucks, Bak-er & Jopling, Oklahoma City, Okl., for defendants Hightower, Penn III and Royalties Services Corp., Ltd.

DOOLEY, Chief Judge.

■ This suit is for declaratory relief to determine the proper division of oil royalties accruing under an oil, gas and mineral lease. The lease in question dated September 3, 1947, was executed by W. F. Simms and numerous other per-sons and companies to R. A. Burnett and B. O. Cornelius, covering a solid body of land comprising 360 acres described in three parcels, being the North ½, the West ½ of the Northwest ¼ of the Southeast ¼ and the East ½ of the Northeast ¼ of the Southwest ¼ of Sec-tion No. 11, I. & G. N. Survey in Carson County, Texas. The said lease, however, did not cover the whole mineral estate in said land, but only 239.5 mineral acres owned by the signatory lessors. It is significant also to point out that the face of this lease reveals an obvious expecta-tion that same would be executed by all of the owners of mineral interests in the described overall tract of land. A look at the typewritten names of the intended lessors listed in the opening paragraph thereof, with also a parallel check of the subscribed signatures thereto, shows that some of the named lessors did not sign and the places provided for their respec-tive signatures remain blank. The ex-hibits and testimony in the record justify

the confident inference that the named, but unsigned, lessors in the present lease, with one or two minor exceptions, or their successors in interest, in certain groups and at different times subsequent to such lease, executed as lessors to the same above lessees, their oil, gas and mineral leases covering separately the same three respective tracts described in the foregoing antecedent lease.

A gas well and also two oil wells were drilled on said original leasehold, one oil well and the gas well in the Northwest ¼ of said Section 11, the other oil well in the West ½ of the Northwest ¼ of the Southeast ¼ thereof, and the production of each well is being marketed. The gas royalty is being paid in fractional parts to the owners of the gas royalty interests under the first aforesaid lease, as well as the gas royalty owners under the said other oil, gas and mineral leases, not drawn into this lawsuit, and said payment of the gas royalty has been made on a prorated basis acceptable to all the royalty owners. The controversy before the Court now is with respect only to the oil royalties payable under the first of the leases.

This subject lease, in the first paragraph, after naming all lessors, then reads "and/or their successors in fractional mineral interests signatory hereto each severally as to their individual record interest, lessor * * *." The meaning of this quoted language must be read against the background of divers interests owned by the different lessors at the time the lease was executed. Some owned uniform or constant fractional interests throughout the 360 acres covered by the leasehold. Others owned varying fractional interests in one part

or more, but not throughout the said tract of land, and said miscellaneous interests were largely concentrated in the Northeast quarter of said Section 11, being held in the main by owners whose interests were confined to that quarter when the lease was executed.

The lease contained a consolidation provision,[1] and also the usual reduction provision,[2] but did not include an entirety stipulation.

The issue which divides the parties is the familiar cleavage between the proponents and opponents of royalty apportionment found typically in litigation with respect to that class of agreements known as community oil and gas leases. The two pilot cases in Texas are Parker v. Parker, Tex.Civ.App., 144 S.W.2d 303, and French v. George, Tex.Civ.App., 159 S.W.2d 566, 569. In the Parker case certain persons owned a tract of 66 acres and others owned a tract of 178 acres, which were contiguous, and all joined in an oil and gas lease, describing the land as a single tract. Likewise, in the French case, the constituent owners executed a lease on three differently owned tracts of land, aggregating 240 acres, in the same section of land, and the point now pertinent is sufficiently covered in the next quoted part of the decision:

"It seems to be established as a general rule of law that where several owners of adjoining tracts of land unite in a single lease to a third party for development of oil or gas as a single tract, and provision is made for delivery of the royalty to the lessors, in the absence of an agreement to the contrary, the royal-

1. "8. The lessee is expressly granted the right and privilege to consolidate the leasehold estate created by the execution and delivery of this lease or any part or parts thereof with the mineral leasehold estate or estates or parts thereof in adjacent lands provided any resulting consolidated estate shall not cover and include more than 640 acres consisting of contiguous tract or tracts that are adjoined. * * * but notwithstanding any consolidation, there shall be no ap-

portionment of royalty payable on oil, and the lessor shall receive the entire royalty payable on oil from wells drilled on the lands of lessor and covered thereby."

2. "Without impairment of lessee's rights under the warranty in event of failure of title, it is agreed that if the lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid lessor shall be reduced proportionately."

ties must be divided among the lessors in the proportion that the areas of the tract owned by each bears to the total area covered by the lease, and the ownership of the tract upon which a well may be drilled and from which oil may be produced is a matter of no consequence."

Several of the other Texas decisions confirming the same principle of law are listed in the footnote.[3]

Some interesting and unusual features of the present lease, not evident on the face thereof, but at the same time undisputed facts, are worthy of passing notice, that is, (1) the major owners in interest among the lessors at the time the lease was executed held uniform and constant interests throughout the whole 360 acres of land, and (2) all of the lessors collectively owned less than a 100% mineral interest in said land. The Texas courts, as it seems, have never given studied attention to the bearing of such circumstances upon the concept of a community lease. The most that can be said is that in one case[4] no express notice was taken of the fact that the lease there in question did not cover a 100% mineral interest in the leased land, and, in another case,[5] the court, by analogy, perhaps, faintly negatives any significance in the fact that a lessor or lessors may have owned uniform and constant mineral interests throughout all the land in a joint oil and gas lease.

In any event, the community lease doctrine in Texas originated in connection with leases covering the 100% mineral estate in the leased unit made up from parcels of land theretofore differently and separately owned, each parcel alone, by various ones or more, but not all, of the lessors. The spirit of the rule is found in

3. Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W.2d 914; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43; Ward v. Gohlke, Tex.Civ. App., 279 S.W.2d 422; and Duffy v. Callaway, Tex.Civ.App., 309 S.W.2d 853.

4. Duffy v. Callaway, Tex.Civ.App., 309 S.W.2d 853.

In that case Callaway and others, together owning all of the mineral interest in a large body of ranch land, (except for an interest owned by Carter) executed their oil and gas lease on said land to one Hawk. Carter executed a separate lease. The first lease was the one in litigation. The court, without any reference to the fact that the lease did not cover a 100 percent mineral interest, since the Carter interest was not joined therein, held that same was a community lease.

5. Thomas Gilcrease Foundation v. Stanolind Oil & Gas Co., 153 Tex. 197, 266 S.W.2d 850.

A owned a $\frac{1}{4}$ mineral interest in each of the Northwest and Northeast $\frac{1}{4}$ of a section. B also owned a $\frac{1}{4}$ mineral interest in said Northwest $\frac{1}{4}$ and a $\frac{3}{4}$ mineral interest in said Northeast $\frac{1}{4}$. C owned a $\frac{1}{8}$ and D a $\frac{2}{8}$ mineral interest in said Northwest $\frac{1}{4}$. A and B executed separate oil and gas leases on the whole North $\frac{1}{2}$ of the section to the same lessee, subject to the usual $\frac{1}{8}$ royalty, and each lease had a reduction covenant, but only B's lease had an entirety agreement. The interests of C and D continued unleased, but they did have an operating contract with the lessee of A and B. Oil was produced from the said Northwest $\frac{1}{4}$. B assigned its interest and the parties disagreed as to the share of royalty due B's assignee. The court held that under the apportionment rule specified in the entirety terms of the lease, B's assignee was entitled to $\frac{1}{2}$ of the $\frac{1}{8}$ royalty on said production. This was pursuant to a surface acreage apportionment resting on the premise that B's $\frac{3}{4}$ interest in the Northeast $\frac{1}{4}$ matched 120 surface acres and the $\frac{1}{4}$ interest in the Northwest $\frac{1}{4}$ matched 40 surface acres, making 160 surface acres, or $\frac{1}{2}$ of the 320 acres in the leases on the North $\frac{1}{2}$ of the section. Obviously, this was very onerous to the lessee who had to pay royalty not only to A and B's assignee, but also to C and D. In speaking of A, whose lease did not contain an entirety stipulation, the court said that the lessor, being the owner of the same interest in each $\frac{1}{4}$ section "would receive the same royalty whether the 'entirety clause' had been inserted or not." Such analogy, as may be between that lease and the present litigation, grows out of the similarity in the incidents of a single lessor lease, containing an entirety provision and a plural lessors lease devoid of the entirety terms, but having the required elements of a community lease.

the attitude that it would be unnatural and quite onerous for any one or more of joint lessors to have his mineral interest held by a lease and still be denied any participation in the royalty compensation under the lease, unless it is clear that such was the intention and contract of the parties in the lease. The Courts of Texas, actuated by a sense of equity, have relieved against such a predicament by holding that, when the lease is silent on the subject, then, as a matter of law, an intention is read into the lease that the lessors are to share the royalty revenue proportionately as measured by their respective contributions in surface acreage to the whole body of land described in the lease. The effect is, on a comparative acreage basis, every lessor in a typical community lease becomes entitled to participate in the royalty earned anywhere on the leasehold and, consequently, each such lessor acquires an interest in some part or parts of the leasehold land not owned by him before the lease was executed. Furthermore, said pooling converts the interest of the respective lessors into a uniform and constant interest for each lessor throughout the leasehold, but with variations, of course, in the gauge of the respective interests among the lessors. That pattern is in contrast with the uniqueness of the instant lease, where there is a lack of the 100% mineral estate in company with constant and uniform ownerships antedating the lease, and it is, at least, arguable whether this lease really falls within the technical class of a community lease, since the real apportionment by surface acreage, named as 360 acres in the lease, is impossible, and any analogous apportionment, taking the 239.5 mineral acres covered by the lease, not only is an innovation, but would uncover some strange quirks, and, at least, would upset the stability of the constant and uniform interests owned by the major lessors at the time this lease was executed.[6]

6. The 239.5 mineral acres under the lease in question, being an undivided part of the 360-acre mineral title, cannot be segregated by any surface perimeter and so is inadequate to be an integral operational unit, but has to be used in conjunction with the outside leases covering nearly all the remaining mineral acres in the whole 360 acre-tract, and the apportionment formula advocated by the minor mineral owners and lessees would often be operative virtually well by well rather than in a uniform pattern for the whole leasehold, since the part of the royalty payments going to the owners of the pre-existing uniform and constant mineral interests would not only differ in amounts from well to well, but sometimes even on the same quantity of production. Moreover, under such apportionment all the minor mineral owners would gain interests in every part or parts of the land where they owned no title at the time the lease was executed, but at the same time the major owners would be left without any subsistent interest of the uniform type previously held by them in all parts of the leased tract from the inception of the lease. At least, the foregoing shuffle and imbalance should prompt a live doubt whether the position being taken by the minor lessors is sound.

The erratic factor imparted by the said contention of the minor lessors is strikingly posed by drawing some contrast found in the environment of the present litigation. For instance, if the lessors executing the present lease, at that time, had also owned collectively and in the same measure of fractional interests, and had leased, another 239.5 mineral acres concentrated in a tract of that area, say the West ½ of the Southwest ¼ and the Southeast ¼ of the Southwest ¼ and the East ½ of the Southeast ¼ and the Southwest ¼ of the Southeast ¼, Section 11, Block 7, making a total of 240 acres, the difference of half an acre being disregarded, and if two oil wells had been drilled on separate parts of said tract, respectively, having the same production as that of the actual wells on the lease in question, then, under a proper apportionment consistent with the true mineral pooling rule in Texas, the owners of the uniform and constant mineral interests would be sharing quite differently in the royalties under said hypothetical lease than they will share if the method of royalty division put forward by the miscellaneous owners, as to the lease here in question, is adopted, and yet the mineral acreage would be exactly the same under both the real lease and the hypothetical lease just mentioned.

Other objective aspects of the vagaries may be noted. First, it is evident that the measure of the pre-existing constant

It is unnecessary in the decision of this lawsuit, however, to rely alone on anticipation of what the Texas courts will rule in respect to whether or not a lease of this very kind is or is not, from the standpoint of pooling and apportionment, a

and uniform interests owned by certain of the lessors remained the same despite the fact that the lease in question covered only 239.5 rather than the full 360 mineral acres. One of those lessors, Simms, who held a ¼ mineral interest throughout the whole 360 acres, is also representative comparably of all companion co-lessors. Let it be supposed that, in a given period, the oil well on the Northwest ¼ section of said lease (which covers only 80, of the 160 mineral acres in such ¼), has a royalty yield equal to $10 per acre for the whole tract of 360 acres, or a total of $3,600. Further, assume that during the same period an oil well on that part of the Southwest ¼ section in the above mentioned hypothetical lease also has a royalty yield of $10 per acre for the whole tract of 239.5 acres, or a total of $2,395. The apportionment proponents would say that the measure of Simms' part of said royalty from the real lease should be 90/239.5 of $1,800 (one-half of the royalty · sum), which is the same thing as .45/239.5 of. the whole royalty sum of $3,-600 making about $675. On the hypothetical lease, despite any defensible theory of apportionment, the measure of Simms' part of the royalty would remain intact at 90/239.5 of $2,395, the whole royalty, making $900. Likewise, if the present real lease covered the 100% mineral interest in the 360 acres of the tract, then again, despite any defensible theory of apportionment, the measure of Simms' part of the royalty sum would remain intact at 90/360 of $3,600, the whole royalty, making $900. In other words, whenever a given lease is signed by lessors collectively owning all the mineral estate 'in-the respective constituents of the lease tract and some of them do and some do not own uniform and constant interests throughout the whole tract, then be it ever so true that the principle of pooling apportionment under the law of Texas comes into play (in the absence of contrary agreement), it will still be found, despite the formula, that the uniform and constant interests held by some of the lessors have come through unchanged and intact, and the only metamorphosis is that each of the other lessors also comes out with what is thereafter a constant and uniform interest throughout the

community lease. An even surer basis is found in the present record. The very cases which stand for the community lease pooling view recognize that a contrary intention expressed by the parties to a joint lease will be paramount.[7] The

whole leasehold, instead of the multiform interests owned before by said respective lessors. Conversely, in a lease of the present type, any pooling and apportionment of royalties, under a formula like that now proposed, will always discompose the percentage of royalty proceeds on production from place to place about the leasehold going to the lessors who owned uniform and constant interests throughout the leased land at the time of executing the lease.

The way that the Simms royalty interest would be dismembered in the shuffle of the apportionment urged herein is put into sharp focus by a look at the reciprocal factor so often used by the oil companies in calculating royalties and, according to one counsel, under that method, the reciprocal factor of the Simms royalty, treating it as ¼ of ⅛ royalty, is .03125 over the whole tract of leased land, while under the proposed apportionment formula, his reciprocal factor for the Northwest ¼ section would be .02348 and for the Northeast ¼ section .040366, and for the East ½ of the Northeast ¼ of the Southwest ¼ section .040366, and for the West ½ of the Northwest ¼ of the Southeast ¼ section .02818.

This tangled spectacle is all traceable to efforts by some of the parties to make this present lease wear the guise of a community lease. The contention being made concedes no significance to the fact that the present lease is complicated by the lack of a 100% mineral coverage and further compounded by the fact that many of the lessors own uniform and constant mineral titles. No Texas court has ever charted any method of apportionment in working terms and calculations under this peculiar type of joint lease, and there is, perhaps, weighty reason and logic, in view of all the involutions herein noticed, to justify the expectation that whenever the specific problem here present confronts a Texas court, the lease will not be classed as a community pooling lease.

7. Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W. 2d 914; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43; Ward v. Gohlke, Tex. Civ.App., 279 S.W.2d 422; and Duffy v. Callaway, Tex.Civ.App., 309 S.W.2d 853.

present subject, of course, is a jointly and collectively executed lease, but that does not necessarily mean it is also a community pooling lease. In one or two of the cases cited, it is pointed out that the opening section of the particular lease, naming the several lessors, then designated them as "lessor", and seemingly some cumulative weight is given to that circumstance along with all the other features recited in the court's opinion. The same singular word "lessor" appears at the same connection in the lease here in suit, but, unlike any of those cases, that word this time is followed immediately by language which nullifies any importance of that single word, and makes it plain enough that in this instance the parties took pains to manifest their purpose that they were acting "severally as to their individual record interest." The word "severally" is not a stranger in the law. It, like many words, has some shades and variety of meanings. The following quotation is taken from 80 C.J.S. p. 128, to wit:

"The term 'severally' is defined as meaning individually; independently; respectively; separately; distinctively; apart from others. It has been said that the word 'severally' directly connotes severalty of interest."

In the light of above definition, and the fair intendment of language, it seems a reasonable conclusion that the lessors in this lease have expressed an evident intention that, in spite of their joinder as many lessors in a single lease, they intended no pooling of their mineral interests in respect to royalty, but instead meant to preserve their respective identity of interests as same stood when the lease was executed. This, of course, would not detract from the singleness of the lease from the standpoint of the rights and liabilities of the lessees.

The decisive effect of said word "severally" in the present lease is further demonstrated by the decision in Garza v. De Montalvo, 147 Tex. 525, 217 S.W.2d 988, 989, where some land, which had been previously leased for the purposes of an oil and gas leasehold, was voluntarily partitioned by the several landowners, without the joinder of the oil and gas lease owner, and the partition instrument, in making the division of shares, recited that each of the respective partitioners "shall, from henceforth have, hold, possess and enjoy, in severalty as to all the other parties to this Agreement of Partition," such one's specified portion of the partitioned land. The partition necessarily had to be made subject to the existing oil and gas lease. The important question was whether, after the partition, the oil and gas royalty interests were still unitized or had become segregated and the ruling on said point was stated, as follows:

"The Garza plaintiffs, by joining in the partition agreement, expressly agreed that each of the Garza defendants should enjoy in severalty the land set apart to him and expressly relinquished to each Garza defendant all interests of every character theretofore owned or claimed by the Garza plaintiffs in such land. As a matter of law it must be concluded that the partition agreement was intended to segregate and did segregate the mineral interests of the parties, including both the possibilities of reverter and the royalty interests."

In weighing the above case, a prime necessity is to keep in mind that the partitioned land was under a pre-existing community oil and gas lease and consequently all of the partitioners had an interest in the pooled royalty rights over all the leased tract. The effect of the consummated partition was to dissolve said royalty pooling and, at the same time, clothe the parties with separate royalty titles tract by tract, respectively, as formed in the partition. That case and this have different phases, but a common principle. In other words, if that partition, where the different owners parceled out their land in different lots to each other, respectively, to be thereafter held by them in severalty, was effectual to unscramble their pre-existing royalty pool-

ing under the outstanding community oil and gas lease, then the express declaration in the present lease, that the respective lessors were joining "each severally as to their individual record interest", by a parity of reasoning, was equally effectual to forestall any scrambling of royalty interests in the first place. What the parties to an oil and gas lease have the power to undo, they must also have the power to avoid doing at the outset. The obvious plight of the parties in said partition was that their respective tracts of land were left bound under the pre-existing lease and, in event of oil or gas production on it, some of them will not share in the royalty proceeds. Likewise, here, under this present lease, as now being construed, some of the lessors will not share in the oil royalty from the two presently located and producing oil wells. The last statement, however, brings to mind again that by some arrangements, not fully explained in the record, all of the lessors are sharing in the gas royalty proceeds under the lease.

■ The intent of the parties in a contract is always entitled to priority in the execution of the agreement. It certainly would seem most implausible to think that the major lessors in interest signing this lease, those owning the uniform and constant interests, ever intended that these interests should be uprooted and reformed in effect by a pooling apportionment of the royalty title. Some argument is made, though it appears inaccurate, that the resulting variations to these lessors would have an offsetting effect eventually, provided comparable production is obtained on all of the constituent tracts not now productive in the leasehold. The lessors who owned such level interests presumably made their investment deliberately and with the prudent purpose of having an even spread throughout the whole section of land, and it is a far cry to speculate that any of them would have wanted to gamble on the outcome of royalty scrambling, such as proposed in this suit. In fact, some of these lessors testified at the trial and protested that they had no such intention,

and tried to make sure that the lease would not bear any such interpretation. This attitude also finds some allied parallel in the consolidation paragraph of the lease, where near the end comes the clause, "but notwithstanding any consolidation, there shall be no apportionment of royalty payable on oil." The remaining element of corroboration is that if all the owners of mineral title in the tract described in this lease had joined as lessors therein, as evidently was the original plan, then the working of any royalty apportionment, like under a community lease, would not have deranged the holdings of those lessors owning level interests throughout the tract.

The proper division of oil royalties is that same be paid in ratable shares to those lessors owning, at the time the lease was executed, an oil and gas interest and title in the particular producing tract of land, or to their record successors in title, and such a judgment will be rendered.