Ralph F. HOWELL et al., Appellants,

v.

UNION PRODUCING COMPANY et al.,
Appellees.

No. 24242.

United States Court of Appeals
Fifth Circuit.

Jan. 22, 1968.

Rehearing Denied March 12, 1968.

---

Will A. Knight, Tyler, Tex., W. Scott Clark, Fort Worth, Tex., for appellants.

B. J. Wynne, Wills Point, Tex., Spencer C. Relyea, III, Dallas, Tex., Thomas Fletcher, Lynn R. Coleman, Robert Bruce LaBoon, Houston, Tex., for appellees.

Before RIVES, WISDOM and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge.

This interpleader action has origins many conveyances and documents ago with the execution of a conventional oil and gas lease. The lease was signed jointly in 1951 by several lessors who owned interests in three tracts of land. The act of executing a joint lease arguably created a "community" wherein royalties from production referable to any one tract would be apportioned to the owners of all land covered by the lease.[1] The court below found a birth of

---

1. See, generally, 3A Summers, Oil and Gas § 612 (1958); 5 Summers, Oil and Gas §§ 951, 956, 963 (by William J. Flittie 1966); Myers, Pooling and Unitization §§ 3.01, 13.01–13.03 (1957, supplemented); Brown, Oil and Gas Leases, § 12.02 (1958, supplemented). Law review commentaries include the following: Huie, "Apportionment of Oil and Gas Royalties," 78 Harvard L.Rev. 1113–45 and 1534–67 (1965); Hardwicke, "Apportionment of Royalty to Separate Tracts—the

community interests in 1951 and survival through 1966; thus, the judge allocated proceeds accordingly. We find contractual lethality in the 1963 agreement and reverse.

Stated as briefly and objectively as possible, the facts and cast of characters are as follows. Union Producing Company (Union) is the assignee-lessee of an oil, gas, and mineral lease executed on May 16, 1951, by a widow, Mrs. Mattie W. McKain, and her children. Through this lease (hereinafter referred to as the McKain lease) the lessee obtained operating rights on three tracts of land containing, respectively, 285.35 acres, 52.5 acres, and 49.39 acres (the latter having been originally surveyed as 46.41 acres but corrected on re-survey). The 49.39 acre tract—which is the focal point of this suit—and the 52.5 acre tract are contiguous, but neither adjoins the 285.35 acre tract. In 1951 all lessors owned undivided fee interests in each of the three lands, which interests combined to constitute 100% ownership.

On June 12, 1958, following the death of Mrs. Mattie McKain, the surviving children partitioned the three tracts among themselves by means of partition deeds. Subsequent conveyances of lessors' interests by means of mineral and royalty deeds occurred frequently, thus accounting for the sparsity of McKains in the present suit.

No production was obtained during the ten-year period specified in the lease. In August of 1960, one year before the lease was to expire, all lessors who then owned executive interests in any part of the three tracts executed an extension agreement for another ten-year period.

On September 11, 1962, under the pooling and unitization authority granted in the lease, Union pooled the 49.39 acre tract with other lands to create the 702 acre Lay Gas Unit. Neither the 52.5 acre tract nor the 238.5 acre tract was included in this unit. A producing gas well was completed on the Lay Gas Unit on December 16, 1962, but no well was or is located on the 49.39 acre tract included in the unit. Subsequent to the declaration of the Lay Gas Unit, Union circulated ratification instruments to the nonparticipating royalty owners of only the 49.39 acre tract. These instruments, hereinafter referred to as the 1963 ratification agreement, expressed ratification of Union's authority to pool the 49.39 acre tract and specified that royalties would be allocated only to lands which were productive.

Production of gas on the Lay Gas Unit precipitated this controversy. The owners of royalty interests in the 49.39 acre tract filed suit in state court to recover all royalties due from the the Lay Gas Unit to the 49.39 acre tract. Objections by owners of interests in the other two tracts caused Union to join all interest holders as defendants in this interpleader suit. Federal jurisdiction is granted under 28 U.S.C. § 1335.

The parties to this suit can be divided into four categories. The first is a group of appellants which the trial court labeled the "Howell Group." Each member of this group owns a mineral or royalty interest in the 49.39 acre tract or part thereof and either executed or holds in privity with a signer or a ratifier of the 1960 lease extension agreement. Likewise, each member either signed or holds in privity with a signer of the 1963 ratification agreement. The second category is occupied by a single appellant, Midwest Oil Corporation. Midwest signed the 1963 agreement but holds a royalty interest in 10 acres in the 49.39 acre tract, which interest was not covered by the 1960 extension agreement. The third category, composed of owners of interests in the 52.5 acre and 285.35 acre tracts, and the fourth category, composed solely

Entirety Clause and the Community Lease," 32 Texas L.Rev. 660 (1954); and Ashworth, "Selected Problems in Voluntary Pooling: A Suggested Rationale," 26 Ohio State L.J. 420 (1965).

Ancillary treatment of the subject is found in McCoy, "The Entirety Clause— Its Current Use and Interpretation," 12 Rocky Mt. Mineral Law Inst. 317 (1967).

of Union, here join in defending the district court's finding of community survival; but their coalition may prove to be vulnerable in the event that Union must pay full royalties from the Lay Gas Unit to the 49.39 acre owners.

 The vulnerability of the appellee coalition warns us that we cannot take the easy route of decision in this case. A reversal solely on the basis of the 1963 ratification agreement would leave unsettled Union's liability to the third category of owners. It would violate the very essence of an interpleader action, which requires that a court attack the legal hydra and cauterize each relevant issue. We are fated to accept this Herculean task even though, as we shall point out, many issues which will confront us have not as yet been solved by Texas courts. We are wary of jurisprudential paternalism in our federalism, and our discussion must not be deemed a preemption of the prerogative vouchsafed to state courts. If we be in error, courts of Texas can indulge in retrocession. However, if we trespass into the state's domain, our trespass is a forced one. In Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 234–235, 64 S.Ct. 7, 11, 88 L.Ed. 9, 13, the Supreme Court stated:

"In the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, which would in exceptional cases warrant its non-exercise, it has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment. * * * [cases cited] When such exceptional circumstances are not present, denial of that opportunity by the federal courts merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of

the state, would thwart the purpose of the jurisdictional act."

See also Fulton National Bank v. Tate, 5 Cir. 1966, 363 F.2d 562, 575–576 (see fn. 24); Texas and New Orleans Railroad Co. v. Cadoree, 5 Cir. 1964, 333 F.2d 682; Duke v. Sun Oil Co., 5 Cir. 1963, 320 F.2d 853, 858; Smoot v. State Farm Mut. Auto. Ins. Co., 5 Cir. 1962, 299 F.2d 525, 529.

We will approach the present saga of communitization through a background of controlling oil and gas principles in Texas law. The Texas Supreme Court has described the basic property rights peculiar to oil and gas as follows:

"The rule in Texas recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. (Citing cases].

Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right. And it is limited only by the physical possibility of the adjoining landowner diminishing the oil and gas under one's land by exercise of the same right of capture. [Citing cases.]" Brown v. Humble Oil & Refining Co., 1935, 126 Tex. 296, 83 S.W.2d 935, 940, 99 A.L.R. 1107, quoted, among others, in Halbouty v. Railroad Commission, 1962, 163 Tex. 417, 357 S.W.2d 364, 374, cert. denied, 1962, 371 U.S. 888, 83 S.Ct. 185, 9 L.Ed.2d 122 and Campbell v. Fields, 5 Cir. 1956, 229 F.2d 197, 201.

Obviously, defensive tactics caused by the rule of capture could lead, and have led, to wasteful drilling [2] with the result that landowners have developed methods of "pooling" or "unitizing" their holdings

---

**2.** "For example, it has been estimated that in the Fairway Field of East Texas, discovered in 1960, only about 70 million barrels of oil could be produced under regulated competitive methods whereas,

unitized and operated as a pressure maintenance project, as much as 200 million barrels will be obtained." 5 Summers, supra note 1, at 55–56, citing statistical authority.

to make wells more profitable.[3] Although the term "pooling" frequently refers to one-well units and the term "unitization" usually refers to larger or more comprehensive units, these terms will be treated herein as synonymous.[4]

■■ Inherent in a desire to pool is the desire to increase net income from one's acreage. A pooling party gives up valuable rights when he allows a lessee to select from the entire unit well sites which may or may not be on his own land, and, ultruism aside, he expects to receive benefits. Thus, pooling agreements often include specific clauses directing the allocation of royalties and other payments among the parties regardless of the actual well site. In at least one form of pooling the allocation of royalties is presumed even if no mention is made of it in the pooling agreement. This is the community lease, which is the primary subject of this litigation. A lease is potentially a "community lease" when multiple lessors owning interests in separate tracts execute it in favor of a single lessee. The intent presumed by such execution is that each lessor allows the lessee to treat the tracts as a unit. From this intent is inferred an intent to apportion proceeds from operations according to the amount of land each lessor contributes to the unit. In Texas royalties are apportioned as a matter of law unless the lease states otherwise. Parker v. Parker, Tex.Civ.App. 1940, 144 S.W.2d 303, error ref.; French v. George, Tex.Civ.App.1942, 159 S.W.2d 566 error ref.; Southland Royalty Co. v. Humble Oil & Refining Co., 1952, 151 Tex. 324, 249 S.W.2d 914; Ward v. Gohlke, Tex.Civ.App.1955, 279 S.W.2d 422, error ref.

Apportionment of proceeds by acreage in community leases can be justified through a conservation policy of encouraging pooling. Apportionment assures landowners that they will not mistakenly bind their land to a unit and then watch helplessly as royalties flow to owners of other lands where wells were placed. Similarly, the apportionment policy has been justified on strictly equitable grounds, as in the first Texas case to establish the doctrine of community leasing. In that decision, in which writ of error was refused by the Texas Supreme Court, the Galveston Court of Civil Appeals ordered pro rata sharing of royalties where owners of different tracts had joined in a single lease, even though no method of apportionment had been expressed in the lease. Parker v. Parker, Tex.Civ.App.1940, 144 S.W.2d 303, error ref. Texas courts have traditionally restated the following rationale in that case, which we shall hereinafter refer to as the *Parker* doctrine:

> "The owners of the land by the form of the lease have empowered the lessee to treat the tract of land as subject to a common ownership, and to keep the lease alive by drilling at any place thereon, and could arbitrarily or accidentally refrain from ever drilling upon the land of one of the lessors, and yet keep such lessor's land subject to his lease. The courts would not place a construction on a contract which would thus work a manifest injustice and hardship upon some of the parties unless the intent was clear and unambiguous." 144 S.W.2d at 305.

The philosophy of *Parker,* valid though it may be, is unfortunately clouded by a separate line of cases in Texas law. Unlike lands subject to the doctrine of community leasing which protects lessors through apportionment, lands subdivided after the execution of a single lease are purchased under rigid caveat emptor. In a case decided fifteen years before *Parker* the Texas Supreme Court denied apportionment of royalties under the following facts. An owner of a fifteen acre tract executed an oil and gas lease cover-

---

3. We will not be concerned here with statutory pooling, enforced for conservation purposes where states deem it necessary.

4. For definitive distinctions of the two terms see 5 Summers, supra note 1, at 54–55 and Myers, supra note 1, at 1.

ing that tract and then conveyed separate segments of the tract to various purchasers. The owner of a ten acre segment succeeded in having the lessee develop only his acreage, and the other owners, whose lands were purchased under and were bound by the original lease, sued for apportionment of royalties. The court's rejection of such claims emphasized a landowner's rights under the Texas rule of capture and expressly resisted any presumption that oil under the non-sharing owners' land was being drained by the producing well. Japhet v. McRae, Tex.Comm'n App. 1925, 276 S.W. 669, adopted by the Tex.Sup.Ct. Moreover, the court did not consider important the consideration which was later found controlling in the *Parker* decision, i. e., the unsuccessful lessor's plight in being bound to a lease from which he would receive no benefit. On this point the court stated: "He traded with his eyes wide open to the rights of the various parties." 276 S.W. at 672.

In *Parker* the Commission of Appeals refused to compare or contrast the fundamental equity rationales of community leasing and subdivision after a lease. The court merely dismissed *Japhet* with the following statement at the end of its opinion: "We affirm the case without further comment than to add that we find that Japhet v. McRae * * * is not in point." 144 S.W.2d at 305. Later cases have attempted to distinguish the doctrines, suggesting that a different awareness can be attributed to a purchaser of a subdivided tract than to a lessor joining with others in a single lease. In the second Texas case to uphold the community leasing principle, French v. George, Tex.Civ.App.1942, 159 S.W.2d 566, error ref., the court used the Commission of Appeals' 1925 language in *Japhet* to distinguish that case: "He [the lessor in *Japhet*] traded with his eyes wide open to the rights of the various parties. No such circumstances exist

in the instant case." 159 S.W.2d 569. Seven years later, the Texas Supreme Court used this awareness rationale in a community partition case in which that court followed *Japhet* and distinguished *Parker* and *French*. Garza v. De Montalvo, 1949, 147 Tex. 525, 217 S.W.2d 988, 992, at [6].

A second *Parker-Japhet* distinction emphasizes the intent of the lease signer rather than that of the lease purchaser. A few courts have pointed out that the community lease itself implies proportional allocation since several lessors have joined together. They add that in a *Japhet* situation only one lessor executes the lease and no fusion of interests can be inferred. Standard Oil Co. of Texas v. Donald, Tex.Civ.App.1959, 321 S.W.2d 602, 606, error ref., n. r. e.; Law v. Stanolind Oil & Gas Co., Tex.Civ.App. 1948, 209 S.W.2d 381, 383–384, error ref., n. r. e.

In 1965 Professor Huie published a scholarly two-part article which highlights and evaluates the various apportionment positions. Huie, "Apportionment of Oil and Gas Royalties." 78 Harvard L.Rev. 1113–1145 and 1534–1567 (1965). He rejects the validity of either *Parker-Japhet* distinction and unequivocally advocates a pro-*Parker* reconciliation, perhaps through statute. Regardless of judicial conformity or nonconformity to Professor Huie's thesis, his well-documented and well-reasoned comments should not go unnoticed.

The *Japhet* decision, the leading authority for denying apportionment of royalties in a subdivision-after-lease situation,[5] did not prevent subdivision and transfers of land subject to a single lease. Lawyers soon developed "entirety clauses" in leases which expressly perpetuated apportionment of royalties despite subdivisions (and which probably created as many problems as they

---

5. The leading authority for the contrary position is Wettengel v. Gormley, 1874, 160 Pa. 559, 28 A. 934, 40 Am.St.Rep. 733, on second appeal, 1898, 184 Pa. 354, 39 A. 57. The extent of the conflict is seen in the twenty-five pages of text and footnote authority devoted to it in 3A Summers, Oil and Gas § 608 (1958).

solved).[6] Moreover, courts would apportion royalties when deeds to subdivided tracts, conveyed subsequent to a single lease, expressed agreement to pro rata sharing under that lease. Hoffman v. Magnolia Petroleum Co., Tex.Comm'n App.1925, 273 S.W. 828, adopted by the Tex.Sup.Ct., discussed in Section II of this opinion, infra. Nevertheless, the *Japhet* philosophy is still very much alive and will be considered in this opinion when we face thus far penumbral areas of the law of royalty apportionment.

### I. The McKain Lease Filed June 29, 1951

The 1951 oil, gas, and mineral lease executed by the McKain family to Union's assignor has all the previously listed aspects of a community lease. Three tracts were described in the lease, but no provisions of the lease distinguished operation on any one tract. All grantors signed the lease and, after the initial mention of their individual names, they allowed themselves to be referred to as a collective "lessor." (This factor was emphasized in both *Parker* and *French.*) Paragraph 3 of the lease provides in part:

"3. In consideration of the premises, and as royalties hereunder, the said lessee covenants and agrees:

(a) To deliver to the credit of lessor, free of cost in the pipe line to which it may connect its wells, the equal one-eighth (⅛) part of all oil produced and saved from said leased premises. Lessee may from time to time purchase any such royalty oil in its possession, paying the market price therefor prevailing on the date of purchase for the field where produced.

(b) To pay lessor for all gas (whether casing-head gas or other gaseous substance) including condensate (sometimes called 'distillate' or 'natural gasoline') produced and saved from said land the following; * * * [describes types of gas]."

Paragraph 17 of the lease allows the lessee to pool "all or any part of the land described herein * * * at its option and without lessor's joinder or further consent." The following method of royalty allocation was specified in paragraph 17:

"As to each such unit so created by lessee, there shall be allocated to the acreage covered by this lease, and included in the pooled unit, such portion of the production (oil, gas, condensate or other minerals) from said unit as the number of acres out of this lease placed in any such unit as such unit from time to time may be constituted, bears to the total number of acres included in such unit, and lessor agrees to accept and shall receive the royalties shut-in or other kind) elsewhere specified in this lease, based upon the production so allocated to this lease or the proceeds therefrom." [7]

---

**6.** See 5 Summers, Oil and Gas § 964 (by William F. Flittie, 1966); Brown, Oil and Gas Leases § 12.01 (1958); McCoy, "The Entirety Clause—Its Current Use and Interpretation," 12 Rocky Mt. Mineral Law Inst. 317 (1967); Hardwicke, "Apportionment of Royalty to Separate Tracts: the Entirety Clause and the Community Lease," 32 Texas L.Rev. 660 (1954).

**7.** Although none of the parties nor the trial judge has argued this point, the method of allocation specified by the above language may well preclude community sharing. A grammatical diagram of the sentence indicates that the two phrases "covered by this lease" and "in-cluded in the pooled unit" both modify the noun "acreage." If so, the relevant sentence syntax can be analyzed as follows. "There," an idiomatic introductory word, has no importance. Therefore, the subject of the sentence begins with "such portion of the production * * *" and it specifies the amount of proceeds for which the lessee must bargain in a pooling agreement. For example, this specification was the subject of controversy in Leach v. Brown, Tex. Civ.App.1962, 353 S.W.2d 920, error ref., n. r. e. The predicate of the sentence, "shall be allocated * * *," specifies to whom the *amount* of proceeds will be *allocated.* Arguably, allocation is only to owners of the land which is both

Despite the above indicia of community two legal obstacles are present in the facts at bar. First, as was mentioned previously, not all of the three tracts included in the 1951 McKain lease adjoined each other. The original doctrine of communitization as stated in *Parker* specifically mentioned contiguity:

> "[W]here parties own different tracts of land which *are contiguous* and lease them in all respects as though they were a single tract owned by the lessors in common, said lessors thereby pool their interest so that they will share pro rata in the royalty no matter from which land oil is produced." 144 S.W.2d at 303. (emphasis added)

We have found no Texas case which expands the community doctrine to include non-contiguous lands. Most communitization cases, in fact, are careful to note that the lands are adjacent. Veal v. Thomason, 1942, 138 Tex. 341, 159 S.W. 2d 472, 473 (discussing a specific allocation clause); French v. George, Tex.Civ. App.1942, 159 S.W.2d 566, 569, error ref.; Law v. Stanolind Oil & Gas Co., Tex.Civ.App.1948, 209 S.W.2d 381, 383, 384, error ref., n. r. e.; Duffy v. Calla-way, Tex.Civ.App.1958, 309 S.W.2d 853, 854, error ref.; Lehew v. Lehew, Tex. Civ.App.1958, 314 S.W.2d 146, 148, error ref.; Standard Oil Co. of Texas v. Donald, Tex.Civ.App.1959, 321 S.W.2d 602, 603, error ref., n. r. e. Moreover, the Texas Supreme Court in 1952 questioned the wisdom of communitization by law and thereby perhaps indicated a reluctance to expand it. Southland Royalty Co. v. Humble, 1952, 151 Tex. 324, 249 S.W. 2d 914, 916.

It is interesting to note that in one of the cases listed above, Duffy v. Callaway, the court quoted with approval a description of communitization by a leading commentator in which contiguity was omitted, 309 S.W.2d at 855. The Texas Supreme Court's refusal of error in that case indicates that the issue has never been placed squarely before Texas courts. Two cases from other states, one indicating a contiguity requirement [8] and one allowing communitization without contiguity,[9] are likewise unconvincing in their failure to meet the issue. Commentators, however, have focused on the question and have been nearly unanimous in rejecting contiguity as an absolute requirement.[10] Although we are inclined to

---

"covered" by the McKain Lease and "included" in the Lay Gas Unit. Perhaps all parties agreed that the specific allocation to the partial acreage is, by communitization, reallocated at law to all lands covered by the McKain lease. However, this could have been specified in the contract itself by eliminating the words "and included in the pooled unit." Similarly, if "allocated to" simply meant "bind to the lease", this could have been stated much more clearly. Finally, to make the word "included" parallel to the verb "allocated" would seemingly create a meaningless sentence. But cf. note 24 infra. Because this admittedly narrow grammatical question is one of contractual intent and has not been raised by any party to the suit, we merely ponder by footnote whether the *Parker* presumption at law is stronger than a contractual inference. Compare *Parker*, 144 S.W.2d at 305 (communitization "unless the intent was clear and unambiguous") with *French*, 159 S.W.2d at 569 (communitization in absence of a "provision of the lease which indicates that any of the parties entertained a contrary purpose or intention.")

8. Lusk v. Green, 1926, 114 Okl. 113, 245 P. 636. This case was decided before the communitization rule had been established in Oklahoma, and the court seemed to be at least equally concerned with the parol evidence rule.

9. Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 1936, 185 La. 751, 120 So. 785. The court apportioned royalties on an acreage basis without commenting on the fact that approximately three quarters of a mile separated two tracts covered by the lease.

10. Huie, "Apportionment of Oil and Gas Royalties," 78 Harvard L.Rev. 1534, 1535 (fn. 90) (1965); Hardwicke, "Apportionment of Royalty to Separate Tracts: The Entirety Clause and the Community Lease," 32 Texas L.Rev. 660, 676, (fn. 39) (1954); Ashworth, "Selected Problems in Voluntary Pooling: A Suggested Rationale," 26 Ohio St.L.J. 420, 425 (1965). It is interesting to compare the definitions in two separate volumes of

include the lack of contiguity as one factor showing absence of community intent,[11] we reject contiguity as a per se requirement. The rationale of *Parker* seems applicable regardless of physical gaps in the fee. Even with non-contiguous tracts of land, production on one tract perpetuates the lease as to all land described in the lease. Orive v. Sun Oil Co., Tex.Civ.App.1961, 346 S.W.2d 383, error ref., explained favorably in Mathews v. Sun Oil Co., Tex.Civ.App., 1967, 411 S.W. 2d 561, 563 (at [1]), error granted.

The second obstacle to communitization involves the nature of each lessor's interest when he executed the lease. In 1951 all parties to the lease seemingly owned the same undivided share in all three tracts, and so communitization would not have changed the allocation of royalties at the instant of execution. Appellant Midwest builds an argument around this factor by pointing out that courts have justified community allocation on a property theory, i. e., that royalty interests have been cross conveyed. To quote the Midwest conclusion regarding the 1951 McKain lease, "A cross conveyance would have been an inanity, and the question of communitization is vapid."

This ingenious syllogism has support in dicta of one federal district court decision,[12] but we must question its internal validity. Although Texas cases have used the cross-conveyancing concept where such could have occurred,[13] no case has required as a sine qua non the immediate alteration of royalty interests. In fact, the following explanation by Justice Calvert of the Texas Supreme Court indicates that communitization is by no means limited to royalty sharing:

"Some of the legal consequences of a unitized lease as between the lessors on the one hand and the lessees on the other, in the absence of express agreement to the contrary, are as follows: the life of the lease is extended as to all included tracts beyond the primary term and for as long as oil, gas or other minerals are produced from any one of the tracts included in the lease; the commencement of a well on any one of the tracts operates to excuse the payment of delay rentals on all included tracts for the period stated in the lease; production from a well on any one of the tracts relieves the obligation to pay delay rentals, during production, on all included tracts; the lessee is relieved of the usual obligation of an implied covenant for reasonable development of each tract separately; wells may be located without reference to property lines; the lessee

Summers, Oil and Gas. Volume 3A, prepared by Professor Summers and published in 1958, defines communitization in a chapter on royalties and includes contiguity in the definition. Volume 5, prepared by Professor Flittie and published in 1966, defines communitization in a chapter on unitization and, although discussing royalties, omits any reference to contiguity.

11. See 2 Williams and Meyers, Oil and Gas 671–672 (§ 521.2) (1964).

12. Phillips Petroleum Co. v. McIlroy, N.D. Tex.1959, 178 F.Supp. 107, 110–111; however, in footnote 5 of that case the judge cites a Texas case as being possibly opposed to the position. Thomas Gilcrease Foundation v. Stanolind Oil & Gas Co., 1954, 153 Tex. 197, 266 S.W. 2d 850.

13. The first case to express this concept was Veal v. Thomason, 1942, 138 Tex.

341, 159 S.W.2d 472. An alternate concept of unitization is based on contract principles and has some support in Texas. See Sohio Petroleum Co. v. Jurek, Tex.Civ.App.1952, 248 S.W.2d 294, no writ history. Despite a lively theoretical dialogue in this area, we see in Texas cases a willingness to temper property principles with contract principles and thus avoid potentially harsh results which have in fact been reached in California, the other cross-conveyance jurisdiction. Compare Duffy v. Callaway, Tex.Civ. App.1958, 309 S.W.2d 853, error ref., with Tanner v. Olds, 1946, 29 Cal.2d 110, 173 P.2d 6, 167 A.L.R. 1219, noted 25 Texas L.Rev. 274 (1947). See also 5 Summers, Oil and Gas § 956 (1966); Myers, Pooling and Unitization §§ 13.01– 13.03 (1957); Ashworth, "Selected Problems in Voluntary Pooling: A Suggested Rationale," 27 Ohio St.L.J. 420, 426–428 (1965).

is relieved of the obligation to drill off-set wells on other included tracts to prevent drainage by a well on one or more of such tracts. As between the lessors themselves, each relinquishes his right to have his own tract separately developed, his right to receive all of the royalties from production from wells on his own tract, and his right to have wells drilled on his tract off-setting other wells on the leased premises, and each gains the right to share proportionately in royalties from wells on the other included tracts. In short, the parties by the execution of a unitized lease agree that production of oil or gas from wells located on any tract included in the lease will be regarded during the life of the lease as production from each and all other tracts included therein. French v. George, supra." Southland Royalty Co. v. Humble Oil & Refining Co., 1952, 151 Tex. 324, 249 S.W.2d 914, 916.

The above language shows that the intent to treat separate tracts as a unit can exist even if interests are already uniform. Moreover, although the concerted execution of a lease may not have altered royalty allocation, it did tend to solidify and perpetuate it.

■ Courts must interpret oil and gas leases in view of the intent of the parties. Smith v. Liddell, Tex.1963, 367 S.W.2d 662, 665–666; Sun Oil Co. v. Whitaker, Tex.Civ.App.1967, 412 S.W.2d 680, 682 (at [2]), error granted, and cases cited therein. We believe that community execution of the McKain lease was performed not out of caprice, but rather out of lease planning. If segregation had been intended instead of integration, separate leases would have accomplished this result.

## II. The Partition Deeds, Filed June 12, 1958

Following the death of Mrs. Mattie McKain, all of the McKain heirs agreed to a partition of the McKain lands, including the three tracts under the 1951 lease. All interests in the 49.39 acre and 52.5 acre tracts were conveyed to Natalie McLain (the spelling is correct although she is in the McKain family) who in turn conveyed away her interest in the 238.35 acre tract. Each of the warranty deeds exchanged in the partition contained a one-sentence provision to the effect that the conveyance therein made was "subject to the mineral deeds, oil and gas leases and reservations now of record." As to the three tracts conveyed by the McKain lease, the parties to the partition were the sole owners of the oil, gas, and other minerals in and under said tracts, and the McKain lease was the only oil and gas lease of record then in effect covering the tracts or any portion thereof.

■ The appellants cite two Texas cases for authority that the partition agreement automatically destroyed the community. Garza v. DeMontalvo, 1949, 147 Tex. 525, 217 S.W.2d 988 and Coates v. DeGarcia, Tex.Civ.App.1956, 286 S.W. 2d 691, no writ history. However, in both cases the method of partition clearly set forth a termination of the community. In *Garza* the court emphasized the language of the partition agreement:

"The language of the parties in their partition agreement is so broad and all-inclusive that it plainly covers mineral rights as well as all other interests in the land owned by them. Each party receives one or more tracts 'in severalty,' and in each instance all of the other parties 'give, grant, set over, convey, release and confirm' to the awardee 'all the estate, right, title, interest, property, possession, claim and demand whatsoever that they have in and to said tract. * * * The agreement goes even further to declare the intention of the parties by expressly stating in the Twelfth paragraph that the respective tracts shall be taken by the parties 'irrespective of any previous claim of any of us in any of said lands and premises.' " 217 S.W.2d at 991.

In *Coates* there was a judicial partition, and the decree clearly atomized the community with these words:

> "Each party to whom a tract or parcel has been awarded * * * shall be the owner of and entitled to receive the full one-eighth royalty of all oil, gas and other minerals produced from his respective tract of land under and by virtue of any such oil, gas and mineral leases."

On the contrary, in the 1958 McKain partition the deeds included only a sentence making the partition "subject to" the 1951 McKain lease.

Unfortunately, our reconciliation of *Garza* and *Coates* with the *Parker* rationale of community leasing must go further than mere notice of the affirmative language in each deed. The partition cases signal the intersection of the *Parker* and *Japhet* doctrines because both fusion and fission have occurred and each carries a contrary presumption at law. The intersection of doctrines is illustrated even more vividly by the case of Lehew v. Lehew, Tex.Civ.App.1958, 314 S.W.2d 146, error ref. In that case a husband and wife, who owned as marital community property a 40 acre tract of land, exchanged partition deeds in contemplation of an imminent divorce. After the exchange but before the divorce they joined in the execution of a single lease covering the entire tract, without specifying how the royalties were to be allocated. The divorce, and the separation agreement accompanying it, vested title in accordance with the original partition. Oil was produced on the entire 40 acre tract, but most production came from wells located on the wife's property. The husband brought suit to compel proportional allocation of royalties on an acreage basis for the entire 40 acre tract. Neither the husband nor the wife contested the *Parker* rationale; moreover, neither party seemed to contest the *Japhet* rationale. Thus, the court accepted both and decided the case on a time sequence, i. e., the transaction that took effect last was legally conclusive

and all-embracing. Finding that the exchange of deeds before the lease was not a truly effective partition, the court held that the partition followed the lease in time, and therefore it refused to allocate royalties on an acreage basis.

The *Lehew* decision can and should be viewed in light of Texas' marital community property principles ("community" here referring to a husband and wife). To the extent that the court found a lease of community property which had not been effectively partitioned, the holding can perhaps be justified on a *Japhet* doctrine because the husband-and-wife community is considered as a single "lessor." In fact, the court indicated this line of thought, 314 S.W.2d at 149 (at [1]). However, the court did not even cite *Japhet* and instead included the following unfortunate segment:

> "It is held that where leased premises are partitioned, or a portion thereof is conveyed by the lessor, that in the absence of an express contract to that effect, the royalty will not be apportioned on the basis of acreage owned, but the owner of each separate tract will be entitled to royalties on oil or gas produced from his tract only. Garza v. DeMontalvo, 147 Tex. 525, 217 S.W. 2d 988 and Coates v. De Garcia, Tex. Civ.App., 286 S.W.2d 691." 314 S.W. 2d at 149.

■ The above language, when read in connection with the case authority cited, seems to create a presumption of nonapportionment even when, prior to the partition, there had been a presumption of apportionment. The Texas Supreme Court's refusal of error magnifies the precedential value of this inference, regardless of whether it was vital to the outcome of the *Lehew* case. However, *Lehew* has never been cited in nearly a decade of existence, and the Court of Civil Appeals' refusal to recognize a valid oil and gas community before or after the effective partition relegates any inference concerning conflicting apportionment presumptions to dictum

Moreover, the suggestion that chronology is conclusive in choosing between two adverse presumptions at law not only is logically frustrating (especially under time sequences similar to the *Lehew* facts), but also is clearly contra to all previous and subsequent decisions by Texas courts. As we pointed out previously, *Japhet* and *Parker* have been distinguished on two grounds. First, a purchaser of a subdivided section of land under a lease is deemed to have purchased with "his eyes wide open to the rights of the various parties." Second, a single lessor is different from joint lessors because he cannot form a community with himself. Strict adherence to the second distinction perhaps even compels continuance of the apportionment presumption in a partition after unitization. Before the partition the parties have formed the community which was lacking in *Japhet*. The first distinction requires that no presumption be placed either for or against apportionment. With their eyes wide open, the parties joined a community and allowed one lessee to treat the lands as a unit. Their act of cooperation was based on a profit incentive, and each expected to reap benefits. Can it be said that each party to the partition then abandoned his assurance of royalties in favor of a gamble that the lessee would drill on his contributed land? At least no presumption to that effect can be defended when the instruments do not so provide. There can be a defiance of community by partition where the transaction is capable of being construed as an act of liberation; however, either the words or the incidence of the transaction must demonstrate some disavowal of former relationships. See Landgrebe v. Rock Hill Oil Co., Tex.Civ.App.1954, 273 S.W. 2d 636, 639–640, error ref., n.r.e. It should be the duty of the trial judge to determine the intent of the parties when the instruments lack precision.

In the case at bar the trial judge found no intent to decommunitize and based his decision to a great extent on the "subject to" clauses in the partition deeds. The appellants claim that, although the clauses perpetuate the express terms of the McKain lease, they cannot be used as evidence that the implied community sharing was perpetuated. We disagree and to the extent of holding that these clauses were sufficient to perpetuate the community even if our interpretation of the *Lehew* decision is later rejected by Texas courts.

Two related Texas doctrines, initiated by two Texas Supreme Court cases, support the trial judge's determination. The first decision was written in 1925 by the same Commission of Appeals which wrote the *Japhet* decision four months later. Hoffman v. Magnolia Petroleum Co., Tex.Comm'n App.1925, 273 S.W. 828, adopted by the Tex.Sup.Ct. Hoffman had sued for royalties due under a 320 acre oil and gas lease which had been executed by a single lessor. The lessor had later conveyed a mineral deed covering 90 acres to the plaintiff, but no well had been drilled on those 90 acres. Hoffman's position was strengthened, however, by the following words in his mineral deed:

"It is understood and agreed that this sale is made subject to said lease, but covers and includes one-half of all the oil royalty and gas rental or royalty due to be paid under the terms of said lease. It is agreed and understood that one-half of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to said Peter L. Hoffman."

Judge Stayton wrote the opinion for the Commission of Appeals. In dictum which was later rejected in *Japhet*, he indicated that the above language was not essential to Hoffman's rights.[14] He

14. Interestingly, it was the same Judge Robert W. Stayton who before his *Hoffman* decision, wrote a *Japhet* opinion which was rejected by the Supreme Court in favor of the present, contrary view. Many years later, as a Professor of Law at the University of Texas, Robert W. Stayton published in the Texas Law Re-

then analyzed the words and in doing so found an arguable intent to allocate royalties regardless of well sites. The case was reversed and remanded to the district court for a new trial with the following affirmation:

"But the instrument must, if possible, be considered and made to speak consistently, as a whole without the rejection of any words, and so as to declare the evident intention of the parties, and the latter is the principal rule to apply * * * [cases cited].

The deed, after conveying the interest in oil, gas, and minerals, and referring, as the description and the allegations show, to the particular 'lease' now under consideration, reads: * * * [quoting above provision in deed].

This is plainly a statement that the deed conveys a one-half interest in the royalty to accrue under the terms of the lease as entirety; that is, the lease upon the whole half section." 273 S. W. at 830.

The *Hoffman* decision has received wide discussion in later cases and commentaries. It has been distinguished frequently and has even been the subject of scholarly criticism.[15] However, the underlying philosophy of *Hoffman* has been affirmed frequently, most recently by the Texas Supreme Court in Andretta v. West, Tex.1967, 415 S.W.2d 638, 640–641. See also Woods v. Sims, 1954, 154 Tex. 59, 273 S.W.2d 617, 621; Richardson v. Hart, 1945, 143 Tex. 392, 185 S.W.2d 563, 565; Grelling v. Allen, Tex. Civ.App.1949, 218 S.W.2d 896, 898–899, error ref., n.r.e. Moreover, the cases distinguishing *Hoffman* have done so factually, on the absence of express intent to apportion royalties Taylor v. Kerlin, Tex.Civ.App.1959, 327 S.W.2d 793,

796–797 (see also [1] at p. 795), error ref., n.r.e.; Robinson v. Humble Oil & Refining Co., Tex.Civ.App.1957, 301 S. W.2d 938, 945–947, error ref., n.r.e.; Kokernot v. Caldwell, Tex.Civ.App.1950, 231 S.W.2d 528, 532–533 (at [6]) error ref.

The *Hoffman* doctrine is that if within the four corners of a deed the parties indicate agreement on a definition of interests, even if their expression lacks pellucid clarity, that definition will be respected. That this doctrine was not affected by *Japhet* is shown by the following language in the latter case:

"This is a case where it is contended that the law itself, in the absence of contract to the contrary, requires an apportionment of the one-eighth royalty. In this respect, it is unlike the case of Hoffman v. Magnolia Petroleum Co., 273 S.W. 828, very recently decided by this section of the Commission of Appeals and the Supreme Court." 276 S.W. 670.

The second Texas doctrine to be discussed answers whether a plain "subject to" clause can be sufficient evidence of an agreement to perpetuate an existing community. In *Japhet* a "subject to" clause in the deeds conveyed subsequent to a lease did not effect a community allocation where none had existed previously. A case on the other end of the community spectrum, however, is Cockrell v. Texas Gulf Sulphur Co., 1956, 157 Tex. 10, 299 S.W.2d 672, in which "subject to" clauses, linked to an express entirety clause in the original lease, did effect community allocation. To be sure, the entirety clause in the original lease read in part as follows:

"Lessors hereby covenant for themselves, their heirs, assigns and suc-

view his 1925 proposed opinion. Stayton "Apportionment and the Ghost of a Rejected View", 32 Texas L.Rev. 682 (1954).

15. Williams, "Hoffman v. Magnolia Petroleum Co.: The 'Subject-To' Clause in Mineral and Royalty Deeds," 30 Texas L.Rev. 395 (1952). Professor Williams

criticized *Hoffman* for creating ambiguity where none had previously existed. In discussing specifically apportionment of royalties, Williams advocated that once *Japhet* was established, it should not have been subject to potential frustrations through inadvertent language in a deed.

cessors in interest, that in case of any change of ownership of said land, or part thereof, whether by conveyance, will, inheritance, partition or otherwise, all rentals and royalties accruing hereunder shall be paid to the new owners in proportion to their ownership of the whole of the land hereby leased so that no owner of a segregated part of said land shall be entitled to the whole royalties accruing from developments on said segregated tract, but only to such part of such royalty as the acreage in his tract is to the whole acreage embraced in this lease; this covenant shall be taken and construed as a covenant running with the land and binding on all successors in interests to Lessors herein."

This clause admittedly differs from an implied community lease not only in specificity of royalty allocation between lessors but also in the lessee's express right to apportion royalties throughout the unit.[16] However, the case at bar is many shades closer to *Cockrell* than to *Japhet*. The formation of even an implied community expresses a contractual intent of the parties. They are exchanging not only royalty rights but also rights to reasonable development, offset drilling, etc. That this relationship should be respected when a new owner takes "subject to" the original lease is supported by the following excerpts from *Cockrell* which applies to this case:

"The inclusion of the 'subject to' clause in the deed incorporated in the deed the leases on the 729.7 acres and *defined the estate conveyed, and the nature, extent and character of such estate.*" 299 S.W.2d at 676. (Emphasis added.)

The court's full discussion of the "subject to" clause shows that, although the

clause by itself cannot vest additional rights, it can justify a trial judge's determination of a continuing community relationship in which rights are exchanged.

In Coates v. De Garcia, supra, a Texas court used *Japhet* to deny continuation of a community following a partition despite a "subject to" clause in the partition deeds. However, as mentioned above, the opinion emphasized contractual principles and pointed out the specific language in the partition which negated proportional allocation. That case, then, must stand only for the standard contract principle that specific terms supersede general terms. In the case at bar we find no words of separation to negate the single clause of continuation.

### III. Rental Division Order, Filed March 5, 1959

By deed dated August 27, 1958, Natalie McLain and her husband conveyed the 49.39 acre tract and the 52.5 acre tract to A. W. Everett, reserving an undivided one-fourth mineral interest for a period of ten years. On January 15, 1959, Natalie McLain, the McKains, and Everett signed and delivered to Union a Rental Division Order which approved the apportionment of Union's annual delay rentals payable to them. The trial judge cited this instrument as further proof that the 1958 partition left the community intact. We do not find clear error in the trial judge's finding; however, we do question its relevance in proving community allocation of royalties because of the following language in the order:

"The division order covers only payment of delay rentals under said lease as to said land, and does not cover royalty payments thereunder."

---

16. The lessee's burden of determining royalty allocation is lessened considerably by the right to apportion solely on the basis of acreage. Thomas Gilcrease Foundation v. Stanolind Oil & Gas Co., 1954, 153 Tex. 197, 266 S.W.2d 850. Brown v. Smith, 1943, 141 Tex. 425, 174 S.W.2d 43, 47. But note that in Garza v. De

Montalvo, supra, the court while allowing a partition of royalties, was careful to acknowledge the agreement of the lessee, even though no entirety clause was in the lease. 217 S.W.2d at 992 (at [4]). Thus, perhaps concern for the lessee's rights is also present in community lease cases.

A delay rental is paid when a lessor holds land without drilling and so the only method of allocation is by acreage. Of course, it can be argued that apportionment of delay rentals makes the non-apportionment doctrine of royalties all the more harsh—a lessor stops getting rentals at the same time that a well is drilled on the lands contributed by another lessor.[17] But the specific language here is controlling.

### IV. Conveyances of Mineral Interests and Royalty Interests, Beginning August 27, 1958

The 1958 conveyance from Natalie McLain to A. W. Everett, mentioned above, was the first conveyance of an interest in land under the 1951 McKain lease to one outside the McKain family. Not quite two years later the conveyancing process began, and continued until 1966, when more than twenty parties had either mineral interests or royalty interests in at least one of the three tracts. By 1966 at least nine parties had interests in the 49.39 acre tract. With only one exception every mineral or royalty deed conveyed between 1958 and 1966 contained a clause substantially as follows:

> "Said lands, or portions thereof, being now under oil and gas lease executed in favor of any valid leaseholder of record, it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes the same interest as first hereinabove named, of all the oil royalty and gas royalty and casinghead gas and gasoline royalty and royalty from other minerals or products, due and to be paid under the terms of said

lease, only in so far as it or they cover the above described land."

The one exception was a revisionary mineral interest deed, dated March 27, 1962, which contained the following language: "This conveyance is subject to any valid lease of record."

The appellants, as in their contentions as to the partition deeds, here claim that the "subject to" clauses apply only to the express terms of the McKain lease and not to the community allocation which is implied at law. They point to the concluding words of the "subject to" clauses, "only in so far as it or they cover the above described land," as additional and contractual evidence that communitization was rejected.

Admittedly, an assignment of a mineral or royalty deed to land covered by a community lease is different from a partition of such land by those who had joined in the lease. In the former case the assignee has never been a part of the community, and so the presumption of community intent following the transaction is weaker than in a partition.[18] However, as the district court found, the acceptance of mineral and royalty deeds could constitute a ratification of the community. See Loeffler v. King, 1951, 149 Tex. 626, 236 S.W.2d 772; Ward v. Gohlke, Tex.Civ.App.1955, 279 S.W.2d 422, error ref., n.r.e.; Leopard v. Stanolind, Tex.Civ.App.1949, 220 S.W. 2d 259, error ref., n.r.e. See also Glasscock v. Farmers Royalty Holding Co., 5 Cir. 1945, 152 F.2d 537, 540, discussed favorably in Reserve Petroleum Co. v. Hodge, 1948, 147 Tex. 115, 213 S.W.2d 456, 457–459, 7 A.L.R.2d 288. Our discussion of the "subject to" clauses in the partition deeds is applicable here.

---

17. See Huie, supra note 1, at 1548–1550.

18. We here update by fourteen years as to Texas law the statement found in Hardwicke, "Apportionment of Royalty to Separate Tracts: the Entirety Clause and the Community Lease," 32 Texas L. Rev. 660, 679 (1954):

"No case has been found on the effect of a conveyance by one of the lessors of a royalty or mineral interest in a

segregated tract that is part of the area covered by the community lease, where the lease contains no entirety clause or other provision for apportioning the royalty."

For hypothets and conclusions see ibid, at 679–681. Relevant cases in other jurisdictions are discussed in Myers, Pooling and Unitization § 13.03 (1957 and 1965 Supp.).

Such clauses cannot increase a grantee's rights, but they can perpetuate relationships.

■ The appellants' argument concerning the concluding language of the "subject to" clauses is not convincing. The mineral and royalty deeds were used to convey *only part* of the grantors' interests in their lands. Thus, they established relationships not only between the grantee and Union and between the grantee and other lessors, but also between the grantee and his grantor. Without the "only in so far" clause the grantee might have been able to share in all royalties accruing to lands owned formerly by the grantor. Hoffman v. Magnolia Petroleum Co., supra. The trial court was justified in finding that the "subject to" clauses in their entirety expanded membership in the existing community rather than destroyed it.

### V. Extension Agreement, Filed August 31, 1960

The 1951 McKain lease was due to expire on May 16, 1961, in the absence of production. On August 1, 1960, Union as lessee entered into an "extension agreement" with all lessors who possessed executive (participating) interests [19] in the three tracts of land. This agreement first referred to the 1951 McKain lease and then provided in part:

"For the same consideration, the undersigned lessors ratify, confirm and adopt the above oil, gas and mineral lease and hereby lease, let and demise the lands and premises hereinabove described unto said lessee, its successors and assigns, upon and subject to all of the terms and provisions set out and contained in said lease, as herein renewed, extended and amended."

Production was still absent on May 16, 1961, and the appellants argue that communitization expired along with the original lease on that date. The district judge found, however, that all parties in this suit (1) had executed either the 1960 agreement or an "in lieu" royalty deed ratifying such agreement, (2) had received their interests from parties bound by the 1960 agreement, or (3) had ratified the 1960 agreement by affirmative action constituting estoppel. The appellees add to that analysis an alternative argument that a lease extension can be executed without joinder of the non-participating royalty owners.

■ The appellees' alternative argument can be discarded with ease. Neither party disputes the holding of Brown v. Smith, Tex.Comm.App.1943, 141 Tex. 425, 174 S.W.2d 43, adopted by Tex.Sup. Ct., that although a lease may be executed by the executive owners alone, royalty interests cannot be pooled without consent of the royalty owners. See also Minchen v. Fields, 1961, 162 Tex. 73, 345 S.W.2d 282, 285; Mathews v. Sun Oil Co., Tex.Civ.App.1966, 411 S.W. 2d 561, 563–564, error granted; Montgomery v. Rittersbacker, Tex.Civ.App. 1966, 410 S.W.2d 925, 928–929, error granted; Guaranty National Bank and Trust of Corpus Christi v. May, Tex. Civ.App.1965, 395 S.W.2d 80, 82, error

19. The following explanation by the district judge below clearly demonstrates how interests can be relegated to nonparticipating status and then relates the definition to the facts in this case:
"Each of the royalty deeds, hereinabove referred to, contained a provision to the effect that the grantee in said deed, by reason of said deed, did not acquire any right to participate in the making of oil, gas and mineral leases on the lands described in said deed and did not acquire any right to participate in any bonus or delay rental that might be paid as a result of any lease of said lands covered by the deed. Thus, the royalty interest conveyed by each of the royalty deeds, above mentioned, was what is commonly referred to as a non-participating royalty interest. Likewise, any royalty interest in the three tracts of land, or any of them, conveyed, as hereinafter set forth, was a non-participating royalty interest unless it is otherwise stated."
See generally, Jones, "Non-Participating Royalty," 26 Texas L.Rev. 569 (1948) and, specifically, the same article at pp. 596–599.

ref., n.r.e. The appellees attempt to distinguish Brown v. Smith by pointing out that all royalty owners ratified the community when they accepted their interests subject to the original 1951 lease. They argue that the royalty interests were not changed by the 1960 agreement because it merely extended the length of a valid legal relationship.

Admittedly under Texas law an oil and gas lease creates a determinable fee vesting property interests in the lessors and lessees. Waggoner Estate v. Sigler Oil Co., 1929, 118 Tex. 509, 19 S.W.2d 27, 28–29. But the possible instances of reverter which divest such interests are defined by the lease agreement. Here the parties agreed in 1951 that interests would divest, among other possibilities, in ten years in the absence of production. Royalty owners who purchased subject to the 1951 lease accepted its terms, but they neither bound themselves to a community allocation of royalty rights beyond such terms nor granted to executive interest owners the power to do so. Parties to a lease can "extend" it, Killam v. Erlich, Tex.Civ.App. 1951, 243 S.W.2d 419, 422, error ref., n.r.e.; Haddad v. Tyler Production Credit Ass'n., Tex.Civ.App.1948, 212 S.W.2d 1006, 1008, error ref.; but cf. Sunac Petroleum Corp. v. Parkes, Tex. 1967, 416 S.W.2d 798, 802, 803, but executive owners have no more authority to perpetuate a community than they do to create one.

Rejection of the appellees' alternative theory requires a review of the district court's analysis of the post-1960 conveyances and especially the executions of "in lieu" royalty deeds. The three such deeds relevant to this case were tendered by owners bound by the 1951 lease as "extended" in 1960 and were accepted by non-participating royalty owners who had held interests before 1960. The trial court correctly held that execution of the "in lieu" royalty deeds effected a ratification of the 1960 extension agreement and the community nature thereof. See our discussion in sections II and IV, supra, as well as the following cases: Greene v. White, 1941, 137 Tex. 361, 153 S.W.2d 575, 136 A.L.R. 626; Poitevent v. Scarborough, 1910, 103 Tex. 111, 124 S.W. 87, 88–89; Doty v. Barnard, 1898, 92 Tex. 104, 47 S.W. 712, 713–714. Our analysis discloses clear error, however, in the trial court's fact finding that all present non-participating royalty interests are held in privity with the "in lieu" royalty deeds. We find that one ten acre royalty interest, held by Midwest Oil Corporation, was never joined. The trial court correctly found that Midwest held 2.48 acres of the 12.48 acre royalty interest from a conveyance by Ralph F. Howell who had signed an "in lieu" deed prior to the conveyance. But Midwest acquired its other ten acre royalty interest from Earl Persons, who had obtained a twenty acre interest before the 1960 extension agreement, and who accepted an "in lieu" deed after conveying the ten acre interest to Midwest. Midwest, as to its ten acre interest, is not in privity with anyone who agreed to extension of the 1951 lease. Moreover, Midwest is not estopped to protect its interests since it has never ratified communitization of its ten acre interest. In fact, its only action as to the lease or extension agreement was signing the 1963 ratification agreement, which we hold destroyed communitization as to the signing parties. The district judge seemingly linked Midwest's ratification as to the 2.48 acre interest with the ten acre interest, but Midwest effectively kept its ten acre interest free of community allocation. As we will explain in the following paragraphs, Midwest's joinder of the community was not required for community validity. Therefore, its ratification could have been confined to the 2.48 acre interest; it did not have to exist on an either/or basis.

The district judge found no reason to deny community intent as of 1960 (or as of the date of the "in lieu" deeds); therefore, community intent presumably existed for all except Mid-

west at least until 1963.[20] Whether a community can be formed without the joinder of all owners of interests has not yet been determined in Texas, but Midwest's partial absence requires us to meet the issue squarely.

The first case in which the issue of partial community joinder could have been vital was decided without mention of the problem. Duffy v. Callaway, Tex.Civ.App.1958, 309 S.W.2d 853, error ref. In the *Duffy* case the Eastland Court of Civil Appeals allowed community as to lessors even though one mineral interest in the tracts had not been joined in the lease. The court gave a scholarly analysis of community leasing but neglected the 100% joinder issue. The problem was first acknowledged in Phillips Petroleum Co. v. McIlroy, N.D.Tex. 1959, 178 F.Supp. 107, 110–111, by Judge Dooley who, admittedly in dictum, voiced disagreement with *Duffy's* sub silent holding. In 1965 the Waco Court of Civil Appeals became the first Texas court to make an explicit statement. In Guaranty National Bank and Trust of Corpus Christi v. May, Tex.Civ.App. 1965, 395 S.W.2d 80, 82, error ref., n.r.e., the Court stated:

> "The authority, however, to pool the non-participating royalty interests can only be granted by the non-participating royalty owners, by either jointly executing the lease, or by ratifying the lease. Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43; Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W. 2d 914; Minchen v. Fields, 162 Tex. 73, 345 S.W.2d 282.
>
> \* \* \* \* \* \*
>
> Under the cited authorities, the royalty interests could not be unitized or communitized without the joinder or ratification of *all* the royalty owners. Ratification by less than *all* of the owners does not effectuate the pooling, and there is no communitization as a matter of law." 395 S.W.2d at 82.

Quoted by the same Court of Civil Appeals in Montgomery v. Rittersbacker, 1967, 410 S.W.2d 925, 929, error granted.

The court cited no authority on point and gave no rationale for its statement. It did not mention *Duffy* or *Phillips Petroleum* anywhere in the opinion. Moreover, the decision was readily decided on the principle of estoppel since the ratifying party, who in court insisted on community allocation, had previously treated other production in a non-communitized manner when it had proved advantageous.[21]

Neither the Court of Civil Appeals nor the Supreme Court in *Duffy* was dismayed by the effect of partial pooling of royalties on either the lessors or the lessee. And though Brown v. Smith, supra, holds that a lessee can require full communitization when by an entirety clause it has contracted for such, that decision points out merely that partial communitization is more onerous than full communitization. It does not suggest that partial communitization burdens the lessee more than a lack of communitization; in fact, implications are to the contrary.

The 100% joinder rule applied in the *Guaranty* opinion is a misapplication of Texas' cross-conveyancing rationale for community allocation.[22] It depends on the image of a community mystique which will vanish unless all ownership components fall in place. It ignores the simple but accepted contractual principle that parties can agree to share benefits.

**20.** The disavowal of community by the Howell Group in the 1963 ratification agreements can easily be explained as a change of heart following the production of gas on the Lay Gas Unit.

**21.** This second justification was the subject of a paragraph in the *Guaranty* opinion following the one quoted above, and actual reliance on the first justification was questioned in a brief commentary on the case. Flittie, "Oil and Gas, 1965–66 Annual Survey of Texas Law," 21 Southwestern L.J. 29, 35 (1967).

**22.** See note 13 supra and accompanying text.

This principle has application in the oil and gas industry where a safe-but-small interest in a large tract may be sought rather than the gamble of a large interest in a small tract.

The vitality of this principle increases upon consideration of the status of a non-participating royalty interest owner who seeks communitization but who fails to get 100% joinder. In Mathews v. Sun Oil Co., Tex.Civ.App.1966, 411 S.W.2d 561, error granted, lands subject to non-participating royalty interests were bound to a lease indefinitely because of production on another tract which had previously been joined, without their ratification, in a community lease. To compound the royalty owners' grief, the court acknowledged that since they had not joined the lease, they could receive no royalties—a figurative Brown v. Smith backlash. The unfortunate plight of such royalty owners would become unconscionable if they had in fact joined the lease but had been denied recovery because of the failure of others to join.

We find in the *Duffy* holding, with error refused by the Texas Supreme Court, at least as much *Erie* elucidation as in *Guaranty's* unnecessary language and therefore recognize the community as of 1963 for all interests except the ten acre royalty interest of Midwest.

### VI. Ratification Instruments, Filed October 24, 1963

In September of 1962 Union joined the 49.39 acre tract with lands outside the McKain lease to form a 702 acre unit known as the Lay Gas Unit. A gas producing well was completed on the unit three months later although no well was or is located on the 49.39 acre tract. Subsequent to the creation of the Lay Gas Unit, Union prepared and circulated to the non-participating royalty interest owners in the 49.39 acre tract identical ratification instruments. Union received said executed ratification instruments and filed them for record on October 24, 1963. Each instrument contained the following provisions:

"The undersigned further acknowledge and agree that their non-participating royalty interests are not, by the execution of this instrument, communitized, and agree that they shall be entitled to royalty only on production from the tract of land under which they own a non-participating royalty interest or lands with which the same may be pooled under the pooling and unitization provisions contained in the above described lease as extended."

All except one[23] of the owners of royalty interests in the 49.39 acre tract either executed a ratification instrument in 1963 or now hold under privity of estate with one who did execute such an agreement. These parties asserted a "counterclaim" in the interpleader action below claiming that, regardless of communitization before 1963, the ratification instruments obligate Union to pay their royalties on a non-communitized basis. The trial court dismissed this claim with the following words:

"The Court fails to find from said ratification agreements or the action of Union in preparing same, having same executed and having same filed for record anything that would create a contract between Union and those executing said ratification instruments which would require Union to pay the royalty from the Lay Gas Unit attributable to the 49.39 acre tract to the Howell Group and Midwest Oil Corporation, or any of them, on a non-communitized basis. Therefore, the Court finds the counterclaims of the Howell Group and Midwest Oil Corporation, and each of them, to be without merit."

To be sure, in oil and gas leases where clauses, phrases, and terms are sprinkled in generous numbers, courts must analyze instruments in their entirety to gather the true intent of

---

**23.** The A. W. Everett Estate holds a small interest in the 49.39 acre tract which was not subjected to a ratification instrument in 1963. That interest, then, will not be affected by our discussion of these instruments.

the parties. Smith v. Liddell, Tex.1963, 367 S.W.2d 662, 665–666; Sun Oil Co. v. Whitaker, Tex.Civ.App.1967, 412 S.W. 2d 680, 682 (at [2, 3]), error granted, and authority cited therein. We have done so, in fact, in all previous sections of this opinion and we will attempt to do so here. On the other hand, basic contract considerations favor objective expressions of intent rather than judicial subjectivity. A recent Texas Supreme Court pronouncement, although dealing with a different oil and gas subject, affirms our preference for objective clues to lease interpretation:

"We recognize that calling the payments royalty is not conclusive as to their true nature, but *words of art are given considerable weight in determining the intention of the parties* * * * [cases cited]." Andretta v. West, Tex.Sup.Ct.1967, 415 S.W.2d 638, 640. (Emphasis added.)

Union insists that the words do not impugn the integrity of community in spite of a declaration of decommunitization. Union seeks no reformation because of mistake, yet makes no rational explanation for the words categorically emancipating the lease from community. The only devitalizing and neutralizing effect that could be given to the words "are not by the execution of this instrument communitized" is to say that these are words of non-waiver and that they merely state that this instrument itself does not import communitization. The most charitable conclusion on this argument would be that the words are unnecessary and such charity seems undeserved (especially when the words are considered as part of the entire sentence). If community were to continue to pervade, nothing need have been said. If appellees are saying, "we have been and are communitized but not by this instrument," words could have been used to enunciate the principle explicitly.

The second part of the sentence states that "they shall be entitled to royalty only on production from the land under which they own a non-participating interest." Can it be said that the non-participating royalty owners on the 49.39 acre tract, while affirming community as to the others, expressly foreclosed their rights to receive from Union shares in production on the other tracts? The only logical and reasonable interpretation here is that the ratification instrument, which gave Union the security that its pooling was proper, decommunitized royalties in the first clause quoted above and specified their allocation in the second clause.

The sentence here in question can be compared with our discussion in Section IV of the final clauses in the mineral and royalty deeds, "only in so far as it or they cover the above described land." In that section we acknowledged that such clauses could have been added to protect against the Hoffman v. Magnolia Petroleum doctrine and thus we affirmed the trial court's finding of a continuing community. We noted, however, that those deeds "established relationships, not only between the grantee and Union and between the grantee and other lessors, but also between the grantee and his grantor." In contrast, the 1963 ratification instruments involve no grantor-grantee relationship and therefore make inapplicable the rationale which we accepted in Section IV. Here, we consider rather simple instruments which can mean only what is indicated on their face. The appellees offer no aid in fulfilling their request to affirm the trial court because, although they give reasons why the words could not have been meant as words of decommunitization, they cannot explain what the words do say.

There are horizons of doubt in the ratification instruments; the words do not compose a symmetrical sonnet.[24]

---

24. For example, the parties could not have meant to require the computations that a literal reading of the terms below indicates:

" * * * and do further covenant, declare and agree with Union Producing Company that in any pool or unit formed pursuant to such pooling and

But certitude in interpretation is not always attainable, and so our decision must be informed by the probable, the likely, without doing violence to or eliminating whole words and clauses from the contract. It borders on the cynical if not the uncandid to negate specific words of decommunitization. Contracts with ambiguity have some plasticity in construction, but contracts are not composed of porous vowels and consonants. Our analysis of the decommunitization provisions gives due weight to each and every word of the ratification instrument and thereby conforms with the following words of the Texas Supreme Court:

> "In construing deeds all parts of the deed must be given effect if possible to do so without violating any legal principles. Even though different parts of the deed may appear to be contradictory and inconsistent with each other the courts must construe the deed so as to give effect to all parts thereof and will harmonize all provisions therein and not strike down any part of a deed unless there is an irreconcilable conflict. Benge v. Scharbauer, supra; Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617 (2–4)." Cockrell v. Texas Gulf Sulphur Co., 1956, 156 Tex. 10, 299 S.W.2d 672, 676, quoted in part in Phillips Petroleum Co. v. Lovell, Tex.Civ.App.1965, 392 S.W.2d 748, 750, error ref., n.r.e.; Coastal States Crude Gathering Co. v. Cummings, Tex.Civ.App.1967, 415 S.W.2d 240, 243–244, error ref., n.r.e.; Williams v. Humble Pipe Line Co., Tex.Civ.App.1967, 417 S.W.2d 453, 455, no writ history.

Appellees, and apparently the district judge, point out that the language concerning royalties does not specifically bind Union to pay on a segregated basis. It merely binds the appellants to accept royalties on a segregated basis. We reject this interpretation, finding that all terms are binding on both Union and the appellants. Union prepared, circulated, and filed the ratification agreements in order to be secure in its participation in the Lay Gas Unit. The instruments which contained clauses such as "covenant, declare and agree with Union Producing Company," were contracts; they were not mere newsletters.

■ Having found that a community can exist without 100% joinder, we conclude that community rights of the appellee-lessors have not been altered by the 1963 ratification agreements. They were not parties to such agreements, as was Union, who unfortunately, has agreed to pay royalties two ways. Our conscience, though aroused, is relieved by the recognition that Union was the scrivener, and lucidity was in its hands and with its pen. While it may be unusual to have double royalty agreements, contract conformity to the usual is not a judicial responsibility. To argue that we must enforce only reasonable contracts or contracts which reasonable men enter into, mistakes our function. We can and do enforce unreasonable contracts if they be clear. Unreasonable men make reasonable contracts and reasonable men may make unreasonable contracts. We dissect the words for meaning; we do not resect them.

■ Community integrity was not impaled by partition, extension, or individual conveyancing because these transactions were framed to ratify rather than nullify. It was ravaged, however, by the words of the Union agreement—an overdose perhaps, but existentially there, and not to be mesmerized into non-being.

Reversed and remanded for further proceedings consistent herewith.

---

unitization provisions which shall cover and include the interests of the undersigned, *the royalties of the undersigned shall be multiplied* by a fraction in which the numerator is the number of acres described in said lease in which the undersigned own an interest, and included in such pool or unit, and in which the denominator is the total number of acres comprising such pool or unit."