[L. A. No. 19460. In Bank. Oct. 1, 1946.]

EMMA TANNER et al., Appellants, v. EMMA F. OLDS, Respondent.

[L. A. No. 19467. In Bank. Oct. 1, 1946.]

ESCROW-DEPOSITARY CORPORATION (a Corporation), Plaintiff, v. EMMA F. OLDS, Respondent; EMMA TANNER et al., Appellants.

[L. A. No. 19472. In Bank. Oct. 1, 1946.]

SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Plaintiff, v. EMMA F. OLDS, Respondent; EMMA TANNER et al., Appellants.

James M. Carter, Burke, Hickson, Burke & Marshall and Daniel G. Marshall for Appellants.

Cree & Brooks for Respondent.

SCHAUER, J.—The problem presented by this appeal from a judgment in a quiet title suit is whether the royalty interest of a colessor in oil produced under a community oil lease is forefeited by reason of the fact that after land owned by him and originally subject to the lease was excluded therefrom, he produced oil on his land and thereby diminished the production of the community wells. For the reasons hereinafter stated, we have concluded that the trial court's determination in favor of such colessor must be sustained.

Certain of the issues here involved have been previously passed upon by this court (*Tanner* v. *Title Ins. & Trust Co.* (1942), 20 Cal.2d 814 [129 P.2d 383]). As stated in our opinion on that appeal each of the parties, or his predecessor in interest, in 1921 joined as lessor with others in a community oil lease to Standard Oil Company as lessee of nine contiguous 5-acre lots in Montebello. The lots are numbered 168 to 176, both inclusive. The lease provides, among other things, that "Lessors agree to, and they do hereby, pool their interest in

this lease, and agree that during the continuance of this lease each owner of land subject thereto shall share in all benefits accruing to the whole lease in the ratio which the acreage owned by said Lessors bears to the entire acreage leased. This provision as to apportionment of benefits to be operative, notwithstanding the surrender by the Lessee of any land described herein.'' The lessee drilled two wells, one on lot 174 and the other on lot 176, and each well has produced oil in paying quantities for some years. Lots 174 and 176 are owned by plaintiff Tanner and plaintiff Hunt, respectively.

On June 1, 1933, the lessee joined with the owners of the nine lots in executing a written agreement by which all of the lots except numbers 174 and 176 were quitclaimed and released from the community lease to their respective owners. On June 30, 1937, such owners secured a decree, which is now final, quieting their several titles against plaintiffs Tanner and Hunt. In the latter part of 1937 defendant Emma F. Olds and her husband, who had joined in the community lease as owners and lessors of lot 173, leased that lot to the Bush Oil Company and in 1939 began receiving royalties on oil produced therefrom. No part of those royalties has been shared with plaintiffs. Mr. Olds died in 1944 and Mrs. Olds is now the sole owner of lot 173 and of the rights formerly held by her and her husband in the community wells. The Bush wells were not slant drilled or whipstocked, but were bottomed entirely on the Olds property.

Until approximately September, 1938, the owners of the nine lots originally covered by the community lease shared equally in the landowners' royalties accruing under the terms of the lease from the wells on lots 174 and 176. Shortly before that time plaintiffs Tanner and Hunt asserted that they alone were entitled to such royalties. Thereupon they brought this action to quiet title thereto and the trial court originally entered judgment in their favor. That judgment was reversed upon defendants' appeal.

In our decision upon the former appeal (*Tanner* v. *Title Ins. & Trust Co.* (1942), *supra,* 20 Cal.2d 814, 823), we held, upon the record then presented, that the owners of the seven surrendered lots ''have the right to participate in all royalties payable under the lease.'' Concerning the one-ninth royalty share of Mr. and Mrs. Olds, the owners of the producing lot 173, we stated, however, at pages 824-825, that ''courts have frequently considered implied covenants as being within a

contract, but such covenants are justified only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed. [Citations.] But the facts of the present case do not show any basis for implying a covenant in the lease which would have the effect of dividing the royalty provided for in it differently than the parties have agreed upon by the plain terms of their contract.

"The respondents [Tanner and Hunt, appellants herein] would be in an entirely different position if their suit was based upon pleadings and proof that the . . . Olds, by the production of oil on their land, are draining oil from the pool tapped by the wells on lots 174 and 176, and are thus impeding the full performance of the community lease.

"Every contract contains an implied covenant on the part of each party not to prevent or hinder performance by the other party. [Citation.] Upon fundamental principles, the law will not allow one to claim royalties under a community lease and at the same time diminish the amount of oil which might otherwise be recovered for the common benefit of all the lessors.

"For example, in *Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.2d 232 [73 P.2d 1163], the defendant leased plaintiff's oil property and also acquired a lease on adjacent land upon which it drilled wells, thereby draining oil from the plaintiff's land. The lease with the plaintiff contained no offset clause. Nevertheless, the court held that a covenant would be implied obligating the lessee to drill wells to offset those on the adjacent property.

"In the present case, however, no evidence was offered to show that the well on the land of the Olds is draining oil from the source of supply under the community lease, and contrary to the contention of the respondents, this court may not take judicial notice of any such alleged fact."

After the remittitur went down appellants Beaty, as the successor of the original lessors of the westerly one-half of lots 171 and 172, intervened as the owners of a one-ninth lessor's royalty interest in the community wells. When the case was tried for the second time the pleadings of all appellants (plaintiffs, and intervenors Beaty) had been amended so as to allege, in effect, that the wells drilled by the Bush Oil Company on Mrs. Olds' lot 173 drained oil from the common pool tapped

by the community wells on lots 174 and 176, and thus impeded the full performance of the community lease. *Escrow-Depositary Corporation* v. *Olds* (*L.A. 19467*) and *Security-First National Bank of Los Angeles* v. *Tanner* (*L.A. 19472*) are interpleader actions involving the same question as that presented in the quiet title action, and are actions in which the monies to be awarded upon final judgment consist of the disputed one-ninth community lease royalties due to the Olds by the terms of the lease. The three cases were tried together, and the court entered judgments decreeing, in substance, that defendant Olds was entitled to her one-ninth share of the community lease production despite the fact that her independent production on lot 173 from its inception in May, 1939, drained the common pool tapped by the community wells and her own well to such an extent that had it not been for the production on lot 173 the community wells would have produced 15 per cent more.

These appeals are from the judgment in each of the three cases, and are before us upon a record consisting in whole of an agreed statement (Rules on Appeal, rule 6) which, so far as concerns the pleadings before the court on the second trial, recites only that, as hereinabove stated, prior to such trial the pleadings of all appellants had been amended so as to allege that the well on lot 173 drained oil from the common pool tapped by the community wells and thus impeded full performance of the community lease. Without a fuller knowledge of the contents of the pleadings we are unable to determine precisely the issues presented at the second trial, or to learn whether plaintiffs Tanner and Hunt now seek to quiet title in themselves alone as against any claim by defendant Olds to an interest in the community royalties or whether plaintiffs intend to share the Olds' one-ninth portion with the other six original lessors or their successors in interest. Consequently we shall consider on these appeals only the question of whether the drilling on the Olds' lot 173 and the resultant lessening of production from the community wells caused a forfeiture of the one-ninth interest of the Olds in the community production.

As ground for reversal, appellants rely solely upon the language quoted hereinabove from our opinion upon the former appeal, and in particular upon the observations that "Every contract contains an implied covenant on the part of each

party not to prevent or hinder performance by the other party. [Citation.] Upon fundamental principles, the law will not allow one to claim royalties under a community lease and at the same time diminish the amount of oil which might otherwise be recovered for the common benefit of all the lessors." However, as is apparent from the further statement in .that opinion to the effect that "In the present case, however, no evidence was offered to show that the well on the land of the Olds is draining oil from the source of supply under the community lease," the second of the above quoted observations is dictum.

And upon further consideration, we are of the view that the first of such two quoted observations is not relevant to any issue presented by the facts before· us. One party to a contract is able to hinder performance by another party only when the contract as to such latter party remains unexecuted, or in other words, when the latter party has not yet completely performed all of his obligations under the contract. But here no one of the lessors in the community oil lease owed any duty of performance to any one of his colessors; the contract as between the colessors constituted a fully executed assignment or conveyance by each lessor to the others of "a percentage interest in all oil produced on his land by the lessee during the continuance of the lease. The consideration for that transfer was the similar mutual assignments of the other lessors." (*Tanner* v. *Title Ins. & Trust Co.* (1942) *supra,* 20 Cal.2d 814, 820.) Such transfer constituted the colessors joint owners, or tenants in common, of all the royalties reserved. (See 8 Cal.Jur.10-Yr.Supp. § 161, p. 779; *Veal* v. *Thomason* (1942), 138 Tex. 341 [159 S.W.2d 472, 476].) The performance which remained to be carried out under the terms of the lease was due only as between the lessee on the one hand and the lessors on the other; consequently no lessor,· or cotenant in the royalties, could possibly hinder a performance from another lessor to which he was not entitled in any event, and the lessee is not a complaining· party before the court.·

Thus the problem is resolved to the question of whether the owner of property may use it for a purpose, otherwise permissible, which lessens the profits of other property in which he is a cotenant, and, therefore, the profits of his cotenants. As stated in our opinion upon the former appeal (p. 820 of 20 Cal.2d), respondent Olds' one-ninth royalty interest in

the community wells is an estate in real property, "an incorporeal hereditament analogous to the right to receive future rents." As also determined in that opinion, there is nothing in the lease contract which restricts the use to which a surrendered lot may be put. Nor does any clause of the lease provide for forfeiture for any cause whatsoever of the one-ninth interest of each lessor in the community production.

And while a cotenant may not commit waste of the common estate (see Code Civ. Proc., § 732; 7 Cal.Jur., § 34, p. 366) we have discovered no authority which suggests that the Olds by producing oil from their own land were committing waste of the community production by reason of the facts that the wells drained from a common pool and that the Olds' well lessened the profits of the community wells.

Subsequent to the surrender agreement and the quiet title action against plaintiffs herein Tanner and Hunt, Mr. and Mrs. Olds held lot 173 as free of the lease as if it had never been included therein. If at the time of the making of the community lease, or at any time thereafter, either before or after the surrender of lot 173, the Olds had owned property contiguous to that originally covered by the community lease but not included therein and had by producing oil therefrom lessened the production of the community wells, it could not upon any theory of law of which we are aware be held that the Olds had thereby forfeited their interest in the community production. Nor after the surrender and quitclaim agreement joined in by the lessee and all of the community lessors and substantiated by a quiet-title decree to the effect "that the plaintiffs, F. H. OLDS and EMMA F. OLDS, were, . . . and now are the owners in fee simple of lot 173 and that the claims of GEORGE TANNER, EMMA TANNER, EMERY B. HUNT, MABEL G. HUNT, . . . defendants, and all persons claiming said premises under said defendants, or any of them, are hereby adjudged to be invalid and groundless, and that the defendants, or any of them, have not any right, title or interest in said premises, or any lien thereon, or any part thereof, and the said defendants are hereby forever barred from any and all claims of right or title to said premises, or any part thereof, and the said defendants, and each of them, are hereby perpetually enjoined from setting up any claim or claims to said premises or any part thereof," were the Olds any more restricted in the uses to which lot 173 could be put

than they would be in the uses of any such other contiguous property which they might own.

Further support for our view may be found in the fact that had Mr. and Mrs. Olds sold lot 173 the purchaser would have taken the land free of any claims or rights of the community lessors or their successors in interest; or had Mr. and Mrs. Olds sold their one-ninth interest in the community production the rights of the purchaser could not be forfeited by reason of the purposes for which lot 173 might be used.

For the reasons above stated, the judgments appealed from are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Spence, J., concurred.

EDMONDS, J.—In my opinion, the rule stated in *Tanner* v. *Title Ins. & Trust Co.*, 20 Cal.2d 814, 825 [129 P.2d 383], that "the law will not allow one to claim royalties under a community lease and at the same time diminish the amount of oil which might otherwise be recovered for the common benefit of all the lessors" has a much broader application than as now interpreted and should be applied as controlling the rights of the parties in the present controversy. It stems from the ordinary principles of honesty and fair dealing which are recognized and applied under a wide variety of circumstances. Simply stated, it declares that one may not take a profit from property which he has transferred for the joint benefit of himself and others when by doing so he gains an advantage over his associates in the enterprise.

A contract contains an implied covenant that a party, even after performing its obligations, will do nothing to prevent the other party to it from obtaining the full benefit to be derived from its performance. More specifically, if one party transfers to the other a right for the purpose of sharing the benefits to be derived from its exercise, the transferor of the right cannot depreciate its value by diminishing the profit to be obtained by its exploitation. Accordingly, it has been held that when the author of a play, or another person entitled to the right to its performance, has transferred that right insofar as stage presentation is concerned, or has given a license for a certain time, he cannot depreciate the value of the thing transferred by granting the right to another to produce the play as a

motion picture. (*Manners* v. *Morosco*, 252 U.S. 317, 327 [40 S.Ct. 335, 64 L.Ed. 590]; *Harper Bros.* v. *Klaw*, 232 F. 609, 613; *Kirke La Shelle Co.* v. *Armstrong Co.*, 263 N.Y. 79, 87 [188 N.E. 163]; see 5 Williston on Contracts (rev. ed.), § 1293A.) As stated by the New York Court of Appeals in the Kirke La Shelle case, *supra*, at page 87, "In the last analysis those cases only apply the principle that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." In *Underhill* v. *Schenck*, 238 N.Y. 7, 14 [143 N.E. 773, 33 A.L.R. 303], the court, in regarding the relation between the licensor and licensee as to the performance of a play, stated: "This fiduciary relation charged the fiduciary with a duty to refrain from forms of competition involving unfair diversion of royalties or profits. The position of such a one is analogous in this respect to the position of a partner. What he gains from a competing business, if the competition is so close as to transcend the bounds of fairness, he is not to keep for himself, but is to surrender to the joint adventure."

Under a community lease, each of the colessors abandons his opportunity for maximum profit from his property in exchange for the right to share in the proceeds to be derived from a much larger tract of land. He insures himself against the risk that the amount of oil which could be produced from his land is less than an agreed share of the possible production from his own property and that of his neighbors as a whole. One who makes such a contract should not be allowed, at a later time, to divert oil from the community well; such conduct amounts to unfair competition with the common enterprise.

Giving effect to these principles, plaintiffs are entitled to recover such amount as will compensate them for the amount by which their royalty has been reduced on account of the diversion by the defendants of oil from the pool tapped by the community wells.