**ARKLA EXPLORATION COMPANY, Appellant,**

v.

**HAYWOOD, RICE & WILLIAM VENTURE, Devane Clark, John Moon, and Bill Driskell, Appellees.**

No. 06–92–00098–CV.

Court of Appeals of Texas, Texarkana.

Aug. 10, 1993.

Rehearing Overruled Sept. 21, 1993.

Sam B. Cobb, Jr., Sam B. Cobb, Jr. & Associates, P.C., Mike A. Hatchell, Ramey & Flock, Tyler, for appellant.

Otis L. Carroll, Ireland, Carroll & Kelley, P.C., Deborah J. Race, Tyler, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

Arkla Exploration Company appeals from a judgment granting damages to Haywood, Rice & Williams Venture, Devane Clark, John Moon, and Bill Driskell, hereinafter referred to collectively as the Appellees. The Appellees have obtained damages against Arkla on the basis that Arkla negligently depleted a gas reservoir under land on which Appellees held oil and gas leases. The principle issue is whether a determination by the Railroad Commission that its rules were not violated by Arkla is binding in a court proceeding for damages.

Arkla raises nine points of error on appeal. Arkla contends that the trial court erred (1) in overruling its motion for summary judgment because the Appellees failed to prove that they owned the working interest under the Warren Hall # 1 Well or that they owned any leasehold damaged by Arkla, (2) in overruling Arkla's motion for judgment non obstante veredicto because there was no finding that Arkla's conduct was willful or illegal, (3) in overruling Arkla's motion for judgment non obstante veredicto because the Railroad Commission had made a final determination on the matters before the court, (4) in overruling Arkla's motion for judgment non obstante veredicto because Arkla had a right to produce the minerals under the rule of capture, (5) in overruling Arkla's motion for new trial because the jury's answers are in irreconcilable conflict, (6) in overruling Arkla's motion for new trial because the jury's answers are not supported by factually sufficient evidence or are against the great weight and preponderance of the evidence, (7) in overruling Arkla's motion for new trial because the jury's award of $1,000,000 in damages was excessive, (8) in overruling

Arkla's objection to the inclusion in the charge of a definition of *waste*, and (9) in refusing to submit Arkla's proposed jury instruction on the rule of capture.

This case focuses on two wells drilled on separate tracts in Marion County which penetrate common oil and gas reservoirs in the Rhodessa Field. The upper-most formation is called the Upper Pettit. The next formation below the Upper Pettit is called the Lower Pettit. The deepest formation involved in this case is the Travis Peak, which lies below the Upper Pettit and Lower Pettit.

In 1944, Arkla drilled the Cromer 2-C well on a lease in Marion County. In drilling the well, Arkla tested the Upper Pettit, but found it unsuitable for commercial production. The well was then drilled through the Lower Pettit and into the Travis Peak, where it was successfully completed. Production began from the Travis Peak in 1944. Arkla also successfully completed the well in the Lower Pettit in 1947. Thereafter, the Cromer 2-C produced both from the Travis Peak and from the Lower Pettit.[1]

The reservoirs in the Rhodessa Field are shaped like an inverted bowl. The Cromer wells were drilled into the crest of the bowl structure, resulting in very high production.[2] While the Cromer 2-C was the most productive Lower Pettit well in the area, there were other wells in East Texas with similar production rates. The Lower Pettit well was abandoned in 1974 after production declined.

In 1988, the Appellees drilled the Warren Hall well on a separate tract, about 5,000 feet from the Cromer 2-C. The Appellees wanted to produce oil from the Upper Pettit and the Travis Peak. Numerous previous attempts to test or drill in the Upper Pettit had indicated that it was unsuitable for commercial production. Upon completing the Warren Hall in the Upper Pettit, the Appellees found that the pressure in the formation was too low to sustain production.

The Appellees came to the conclusion that Arkla had actually produced gas from both the Upper Pettit and the Lower Pettit through the Cromer 2-C. By removing so much gas from the Upper Pettit, the Appellees theorized, Arkla had reduced pressure in the Upper Pettit to the point that oil could no longer be produced.

The Appellees filed suit against Arkla alleging that Arkla had drained gas from the Upper Pettit through the Cromer 2-C. The Appellees contended that this drainage constituted negligence and a violation of Railroad Commission rules. The trial court granted a continuance to allow Arkla to seek an administrative ruling on the alleged rule violations. The Railroad Commission determined that (a) Arkla did not produce gas from the Upper Pettit through the Cromer 2-C, (b) that Arkla's operation of the Cromer 2-C did not violate Commission rules, and (c) that the Upper Pettit was not suitable for commercial oil production. The case was then tried to a jury, which returned a verdict in favor of the Appellees. Specifically, the jury found that (a) Arkla depleted a common reservoir in the Upper Pettit, (b) Arkla's conduct was negligent, (c) Arkla's conduct proximately caused loss of recoverable oil from the Upper Pettit underlying the Appellees' leases, and (d) the Appellees sustained $1,000,000 in damages. The jury failed to find that Arkla's conduct was illegal or willful.

We first address Arkla's third point of error, which we find to be dispositive of this case.[3] Our determination of this issue makes

---

1. The portion of the well completed in the Travis Peak is known as the Cromer 2-T, while the portion completed in the Lower Pettit is the Cromer 2-C, the subject of this suit.

2. During its life, the Cromer 2-C produced over thirteen BCF of gas from the Lower Pettit.

3. The trial court erred in overruling Arkla's motion for judgment non obstante veredicto, because the essential premise of plaintiff's case (i.e., that Arkla depleted the pressure necessary to produce the Warren Hall # 1 Well in commercial quantities by illegally producing gas from the Upper Pettit formation) has been determined to the contrary by the Final Order of the Railroad Commission of Texas in Oil & Gas Docket No. 6-97,038. Therefore, resolution of the inquiries in Questions 1, 2, 3, and 4,

(a) is vested in the primary jurisdiction of the Railroad Commission of Texas,

(b) has been determined adversely to plaintiffs in the February 10, 1992, Final Order of the Railroad Commission in Oil & Gas Docket No. 6-97,038, and

it unnecessary to reach the other points of error.

## Primary Jurisdiction

▉ Arkla contends that the authority and original jurisdiction of the Railroad Commission prevents a party from seeking damages in a core proceeding without preliminary fact findings by the Railroad Commission. The Railroad Commission is authorized to inquire into all matters concerning oil and gas to determine whether or not waste [4] exists or is imminent or whether the oil and gas conservation laws or the rules and orders of the Commission are violated. TEX.NAT.RES.CODE ANN. § 85.058 (Vernon 1993). The Railroad Commission is vested with power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights of producers. *Texaco, Inc. v. Railroad Commission*, 583 S.W.2d 307 (Tex. 1979).

The case of *Sun Oil Co. v. Martin*, 218 F.Supp. 618 (S.D.Texas 1963), *aff'd*, 330 F.2d 5 (5th Cir.1964), closely resembles the present case factually. In that case, a suit was brought for damages alleged to have been caused by the defendant's violation of the Railroad Commission rules through wrongfully or negligently producing from a sand level from which production was not authorized by the Railroad Commission. The trial court concluded that under Texas oil and gas conservation statutes, the Railroad Commission, being the statutory enforcement agency, must also be the primary or original statutory factfinding agency, citing *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 81 (1939). The trial court applied the doctrine of primary jurisdiction,

holding that the question demanded the exercise of administrative discretion and required the special knowledge and experience of the Railroad Commission, citing *Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W.2d 753 (Tex.Civ.App.–Waco 1950, writ ref'd). The trial court found that the Railroad Commission by statute had exclusive original jurisdiction to determine the proration for natural gas fields in the state, citing *Chenoweth v. Nordan & Morris*, 171 S.W.2d 386, 388 (Tex. Civ.App.–San Antonio 1943, writ ref'd w.o.m.). In conclusion, the trial court determined that to obtain a damage judgment, the plaintiff must obtain a determination by the Railroad Commission that gas was wrongfully taken by the defendant and the quantity of gas wrongfully taken. On appeal, the Fifth Circuit upheld the trial court's ruling that primary jurisdiction was in the Railroad Commission. *Sun Oil Co. v. Martin*, 330 F.2d 5.

TEX.REV.CIV.STAT.ANN. art. 6049c, § 13 [5] as it existed at the time the federal court made its ruling reads as follows:

Nothing herein contained or authorized and no suit buyer against the commission, and no penalties imposed upon or claimed against any party violating any statute of this State, or any rule, regulation or order of the Commission shall impair or abridge or delay any cause of action for damages, or other relief, any owner of any land or any producer of crude petroleum oil or natural gas, or any other party at interest, may have or assert against any party violating any rule, regulation or order of the Commission, or any judgment herein mentioned. Any party owning any interest in any property or production which may be damaged by any other party violating this Act or any other Statute of this State

---

(c) relitigation of the facts determined in that order is an impermissible collateral attack upon a final order of the Railroad Commission.

**4.** The definition of *waste* includes underground waste or loss, however caused. TEX.NAT.RES.CODE ANN. § 85.046(a)(3) (Vernon 1993).

**5.** Now it is contained in TEX.NAT.RES.CODE ANN. § 85.322 (Vernon 1993) in the following language:
None of the provisions of this chapter that were formerly a part of Chapter 26, Acts of the 42nd Legislature, 1st Called Session, 1931, as

amended, no suit by or against the commission, and no penalties imposed on or claimed against any party violating a law, rule, or order of the commission shall impair or abridge or delay a cause of action for damages or other relief that an owner of land or a producer of oil or gas, or any other party at interest, may have or assert against any party violating any rule or order of the commission or any judgment under this chapter.

prohibiting waste or violating any valid rule, regulation or order of the Commission, may sue for and recover such damages, and have such other relief as he may be entitled to in law or in equity.

In light of this statute and Section 85.321 of the Natural Resource Code,[6] we question the necessity of requiring a ruling by the Railroad Commission in this case under these circumstances. The present case differs from the *Sun Oil* case because the matter had been addressed by the Railroad Commission. We do not, therefore, reach the question of the proper disposition when there has been no Railroad Commission determination. The Railroad Commission found that its rules were not violated. The question is when the Railroad Commission has made a determination within its authority, would this determination be subject to collateral attack?

### Collateral Attack Upon The Railroad Commission Order

■ Collateral attack on a judgment is an attempt to avoid its binding force in a proceeding not instituted for the purpose of correcting, modifying, or vacating it, but in order to obtain some specific relief against which the judgment stands as a bar. *Hogan v. City of Tyler,* 602 S.W.2d 555 (Tex.Civ. App.–Tyler 1980). The rules concerning collateral attack apply to orders or judgments of quasi-judicial bodies, such as the Railroad Commission, as well as to the courts. *Railroad Commission of Texas v. McKnight,* 619 S.W.2d 255 (Tex.Civ.App.–Tyler 1981, no writ).

■ The general rule is that orders of the Railroad Commission within its delegated authority are immune from collateral attack unless they are void on their face. *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945); *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681 (1941); *Coastal States Gas Producing Co. v. Lower Colorado River Authority,* 544 S.W.2d 733 (Tex.Civ.App.–Eastland 1976), *writ ref'd n.r.e. per curiam,* 551 S.W.2d 340 (Tex.1977). The Appellees have cited no cases and we have found none that reject this general rule. The Appellees do not argue that this is not a viable rule in Texas. Instead, they contend that the court proceedings were not a collateral attack in the present case because their suit was couched in terms of negligence and because the Railroad Commission could not award them damages.[7]

In *Bolton v. Coats,* 514 S.W.2d 482 (Tex. Civ.App.–Tyler 1974), the court of appeals determined that the basis of the plaintiff's suit required a reclassification which had been denied by the Railroad Commission and that the denial by the Railroad Commission was not subject to collateral attack. The Texas Supreme Court, however, determined that *Bolton* had other pleadings for damages that were separate from his attack upon the Railroad Commission's order and was entitled to his day in court on those separate allegations. Specifically, the Supreme Court found that the plaintiff was entitled to trial on his allegations that he was entitled to royalty on large amounts of oil that had been produced from the gas well and that the defendants were breaching their duty to explore and produce oil from known oil sand under the property in order to prevent drainage.[8] *Bolton v. Coats,* 533 S.W.2d 914 (Tex. 1976).

---

**6.** Section 85.321 of the Natural Resources Code specifically provides that a party can bring suit to recover damages when a law of this state has been violated which prohibits waste or when a valid rule of the Railroad Commission prohibiting waste has been violated. If the suit is against the leaseholder or operator, the statute provides that it shall be a defense that the owner or operator was acting as a reasonably prudent operator would act under the same or similar facts or circumstances. Tex.Nat.Res Code Ann. § 85.321 (Vernon 1993).

**7.** On rehearing, the Appellees complain that the Railroad Commission did not have authority to

make its ruling because the matter was not properly initiated before the Commission. We have found no rule restricting an interested party from seeking a hearing and determination by the Railroad Commission. To hold that the Railroad Commission had no authority to conduct a hearing and make a determination in the present case would be to hold that the Railroad Commission had no right to conduct a hearing to determine if its own rules had been violated.

**8.** The dissent characterizes *Bolton v. Coats,* 533 S.W.2d 914 (Tex.1976), as a suit "for damages for drainage by oil wells on adjacent leases."

In *Amarillo Oil Co. v. Energy–Agri Products,* 731 S.W.2d 113 (Tex.App.–Amarillo 1987), the Amarillo Court of Appeals held that the basis of the plaintiff's suit amounted to a collateral attack upon a valid order of the Railroad Commission classifying its wells. The court of appeals invoked the doctrine of primary jurisdiction and refused to allow a collateral attack on the Railroad Commission order. The Texas Supreme Court, however, held that the cause was properly within the jurisdiction of the courts because the Railroad Commission had no authority to determine title and ownership of property, to construe a lease, or to grant an injunction. *Amarillo Oil Co. v. Energy–Agri Products,* 794 S.W.2d 20 (Tex.1990). In neither of these Supreme Court decisions overruling the lower courts did the Texas Supreme Court override determinations made by the Railroad Commission. Instead, the Supreme Court found that there were causes of action separate from the matters covered in the Railroad Commission orders.

There are at least three significant differences between these cases and the present case: (1) In the *Bolton* and *Amarillo Oil Co.* cases, the plaintiffs did not have to obtain fact findings contrary to the fact findings made by the Railroad Commission on matters within its authority; in the present case, in order for the plaintiffs to prevail, the fact finder would have to determine that the facts were contrary to the fact determinations made by the Railroad Commission. (2) In the *Bolton* and *Amarillo Oil Co.* cases, there were factual allegations that did not directly relate to the subject matter addressed by the Railroad Commission; in the present case, the material factual allegations had been addressed by the Railroad Commission. (3) In the *Bolton* and *Amarillo Oil Co.* cases, the plaintiffs did not allege a cause of action that relied on the failure of the defendants to obtain an authorization from the Railroad Commission; in the present case, the plaintiffs' cause of action relied entirely on the allegations that the defendant produced the

Upper Pettit without obtaining an authorization from the Railroad Commission.

In the present case, there are no allegations of acts by Arkla that are not covered by the Railroad Commission's order. The only way that a judgment could be granted against Arkla was on a factual basis diametrically to the contrary of the Railroad Commission's determination. The Railroad Commission determined that Arkla had not violated the Railroad Commission's rules by producing gas from the Upper Pettit.

The Appellees did not choose to participate in the Railroad Commission proceeding, to appeal the Railroad Commission's findings to the district court of Travis County, or to seek to enjoin the Railroad Commission proceeding as an interference with a pending suit. The order of the Railroad Commission is final and was admitted into evidence. The Appellees' only objection to the introduction of the rulings and findings of the Railroad Commission was that the witness on the stand at that time was not the proper witness to sponsor the exhibit.[9]

The Railroad Commission order, issued on February 10, 1992, in Oil & Gas Docket No. 6–97,038, included the following:

### FINDINGS OF FACT

The evidence submitted supports the following findings of fact:

1. All parties entitled to notice were given notice of the hearing on this application at least 10 days prior to hearing.
2. This application is unprotested. Arkla Exploration Company was the only person to submit evidence at the hearing.
3. The Arkla Alma Cromer Well No. 2 was originally drilled and completed in 1944 as a Travis Peak completion. It was later dually completed, pursuant to proper authority, in the Travis Peak and Lower Pettit zones. The well produced a total of 14 BCF from the

---

This is misleading in that it suggests that this action was against third parties owning the adjacent leases, but in fact it was against their own operator for not seeking to drill protective offset wells.

9. "Object, Your Honor. This is not the right witness. If they have a witness that wants to sponsor it—."

Lower Pettit before abandonment in 1974.

4. While drilling the well, Arkla tested and cored the Upper Pettit. That formation was determined to be too tight to be productive. The Upper Pettit was cased and cemented off. The well records show that the Upper Pettit has never been perforated. The cement bond log indicates there is a good bond between the Upper Pettit interval and the Lower Pettit perforations.

5. There are approximately 34 BCF of reserves in place in the Lower Pettit Field. Cumulative production in the field since 1944 is approximately 30 BCF. The·Cromer Well was the highest producing well in the Lower Pettit and the best well in the field. Approximately two-thirds of cumulative production from the Lower Pettit was produced in the first four years of its life.

6. A 90% recovery factor in the Lower Pettit is reasonable for this reservoir.

7. The Upper Pettit has been tested in approximately 20 wells in the area. All tests show the Upper Pettit to be tight with low permeability. A number of the wells tested are closer to the location of the Warren Hall Well than the Alma Cromer Unit No. 2. The only reported production from the Upper Pettit has been from wells located more than 2 miles from the location of the Warren Hall Well.

8. *The test of the Warren Hall Well does not indicate drainage of the Upper Pettit at that location by production from the Alma Cromer Unit No. 2 Well. The test of the Warren Hall is indicative of a tight, low permeability reservoir in the Upper Pettit,* and is similar to other tests of the Upper Pettit in the area.

9. Railroad Commission Rule 10 states that oil or gas shall not be produced from different strata through the same string of casing except as set out under the rule. *The evidence shows that the Upper Pettit in the Cromer Well No. 2 has not been produced through the same string of casing as the Lower Pettit at that location, and that the Upper Pettit is not capable of commercial production at that location.*

10. Rule 16 requires the operator of a well to correctly report all perforations. *The completion reports for the Cromer Well No. 2 properly show it to have been completed at times in the Travis Peak and/or the Lower Pettit.*

## CONCLUSIONS OF LAW

1. Notice of this hearing was issued in accordance with the applicable statutory requirements.

2. *The Cromer Well has not been operated in violation of Rule 10.*

3. *The Cromer Well has not been operated in violation of Rule 16.*

(Emphasis added.)

A review of Appellees' contentions in the trial court,[10] the proof presented,[11] and the

---

10. The following are excerpts from the plaintiff's first amended original petition upon which they went to trial:

The Plaintiffs believe that Arkla produced massive quantities of gas from the Upper Pettit Sand through the wellbore of the Cromer # 2–C without first obtaining proper approval from the Texas Railroad Commission as required by then existing Statewide Rules 11 and 15. The requirements of those rules are now found in the Commission's Statewide Rules 10 and 16.... Because Arkla did not follow this procedure, the production from the Upper Pettit Sand through the Cromer # 2–C was illegal production. As such, Plaintiffs are entitled to bring this action for damages to their correlative rights in the common Upper Pettit reservoir due to such illegal production.

....

In the alternative, Plaintiffs submit that Arkla was negligent insofar as failing to discover that the inordinate amount of production coming from the Cromer # 2–C was in fact production from an unpermitted zone, i.e. the Upper Pettit Sand.

....

In the alternative, Plaintiffs submit that Arkla's conduct in negligent, intentionally and/or illegally depleting the Upper Pettit Sand created waste insofar as the loss of valuable oil reserves in the Upper Pettit Sand underlying their leases.

11. Appellees' expert, James R. Smith, testified that in his opinion the Upper Pettit had been depleted by production by Arkla's Cromer well that was permitted only for production in the Travis Peak and Lower Pettit zones.

jury questions [12] show that the thrust of their suit was that in its Cromer 2–C Well Arkla produced and depleted the pressure in the Upper Pettit zone without approval of the Railroad Commission and that they were damaged when they later drilled their Warren Hall Well into the Upper Pettit and found that it was depleted of pressure and gas. The entire case hinges on whether Arkla violated the Railroad Commission rules by producing a zone without the Railroad Commission's approval. Couching the allegations of the conduct of Arkla in terms of negligence does not alter the thrust of the Appellees' suit. Whether such conduct had been done by Arkla intentionally or negligently, it would still constitute a violation of the Railroad Commission rules.[13] If the Railroad Commission had determined that Arkla had produced and drained the Upper Pettit in violation of its rules, the Appellees could have sought a court determination that such conduct was negligent or intentional and asked for damages on that basis.

The Railroad Commission fact findings reflect that the Warren Hall Well was not drained by the Cromer 2–C, that Arkla had not violated Railroad Commission Rule 10 by producing the Upper Pettit, that the Upper Pettit was not capable of commercial production at the Warren Hall Well location, and that the Cromer 2–C Well was not perforated at the Upper Pettit in violation of Rule 16 of the Railroad Commission. These findings negate the production or drainage of gas from the Upper Pettit by the Alma Cromer 2–C Well. The Railroad Commission further concluded that the Upper Pettit at the Warren Hall Well location was not capable of producing in commercial quantities because of the tight formation with low permeability.

The findings by the Railroad Commission that Arkla had not violated its rules by producing at a sand level not authorized by the Railroad Commission is a finding which is not subject to collateral attack. The Railroad Commission's findings cover all of the allegations made by the Appellees in this suit. These findings are not subject to collateral attack; thus, Arkla is entitled to judgment.

The judgment of the trial court is reversed, and judgment is rendered that Appellees take nothing.

CORNELIUS, Chief Justice, concurring.

I concur in the majority opinion and judgment, but I write separately to state why I also believe the jury's finding that Arkla was negligent is against the great weight and preponderance of the evidence. Consequently, even if a rendition were not required, I would reverse the judgment and remand the cause for a new trial.

There is a recognized cause of action for negligent or reckless destruction of adjacent oil and gas reserves. *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558 (1948); 1 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS §§ 4.5, 4.6 (1987). But to succeed in it, the plaintiff must do more than prove that production from an adjoining operator's well depleted reserves or pressure in the plaintiff's land. He must prove that the production was either in violation of Railroad Commission rules designed to prevent waste or that *the manner of drilling or production* was negligent or reckless. *Elliff v. Texon Drilling Co., supra.*

Appellees here pleaded only that the depletion of pressure in the Upper Pettit zone "came about from *unreported and illegal production*" in that Arkla produced gas from its Cromer 2–C well "*without first obtaining proper approval* from the Texas Railroad

---

12. The jury was asked: "Did the Defendant, through its Cromer 2 well deplete a common reservoir of gas from the Upper Pettit sands underlying the lands covered by the Plaintiffs' oil and gas leases?" All the remaining questions dealt with whether the conduct had been intentional or negligent, whether it was a proximate cause of damages and the amount of damages.

13. The dissent asserts that there can be negligence without the violation of an ordinance or statute. We agree. However, in the present case, the Appellees take the position that Arkla's negligence was producing the Upper Pettit in violation of the Railroad Commission rules. If Arkla had produced the Upper Pettit with authorization of the Railroad Commission, it would have had a right to take the gas under the rule of capture. *See Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558 (1948).

Commission *as required by existing State-wide Rules* 11 and 15." They further alleged specifically that, because Arkla did not follow Railroad Commission rules, "the production from the Upper Pettit Sand through the Cromer # 2–C well was *illegal production.*" They also added a conclusory allegation that Arkla's "negligent and illegal conduct" created waste, but there is no evidence that Arkla did anything negligent except allegedly violating Railroad Commission rules, and the jury found that Arkla did nothing illegal.

Appellees produced only one witness of their own, James Smith, a petroleum engineer. Smith gave no direct evidence that Arkla had drained, or produced its Cromer 2–C well from, the Upper Pettit formation. Essentially, his testimony amounted to assumptions on his part that, because of the unusually high productivity of the Cromer 2–C well and the fairly equal pressure levels existing in the Upper Pettit and Lower Pettit formations more than forty years after the Cromer well was drilled, there must have been "communication," as he called it, between the Upper Pettit and the Lower Pettit; in other words, he assumed that the Cromer 2–C well produced some from the Upper Pettit zone when it was permitted to produce only from the Lower Pettit and the Travis Peak zones. Smith's opinions were pure speculation, however, and they were absolutely refuted by the findings of the Railroad Commission, which were admitted into evidence as facts, and by the expert testimony of Arkla's witnesses, Robertson and Gaston.

The Railroad Commission findings and conclusions of law established, among other things, that: all of the fourteen BCF produced from the Cromer 2–C well was produced from the *Lower Pettit zone,* (Finding of Fact No. 3); Arkla tested the Upper Pettit in the Cromer 2–C well, but it was too tight to produce, so Arkla *cased and cemented it off* and that there is a *good bond* between the Upper Pettit and the Lower Pettit, and the Upper Pettit in the Cromer 2–C well has *never been perforated,* (Finding of Fact No. 4); there were thirty-four BCF of reserves in the Lower Pettit and thirty BCF have been produced from that zone, (Finding of Fact No. 5); tests of appellees' Hall well *do not*

*indicate* drainage of the Upper Pettit by production from the Cromer 2–C well, (Finding of Fact No. 8); the Upper Pettit in the Cromer 2–C well *has not been produced* through the same string of casing as the Lower Pettit at that location, and the *Upper Pettit is not capable of commercial production* at that location, (Finding of Fact No. 9); the Cromer 2–C well was properly completed *at all times* in the Travis Peak and Lower Pettit, (Finding of Fact No. 10); and the Cromer 2–C well has not been operated in violation of Railroad Commission rules, (Conclusions of Law No. 2 and 3).

Smith's conclusion that Arkla was negligent and had committed waste was based wholly on his assumption that Arkla had produced or drained the Upper Pettit without permission. There was neither allegation nor evidence that the Cromer 2–C well was either drilled or operated in a negligent manner. In fact, Smith admitted in his testimony that the only negligent or improper thing he contended Arkla had done was to produce or allow drainage from the Upper Pettit in its Cromer 2–C well.

Smith speculated that Arkla had "blown" the gas cap in the Upper Pettit, which caused a loss of pressure. But "blowing the gas cap" is simply producing or draining the gas from the reservoir, and the undisputed direct evidence from the Railroad Commission and from Arkla's witnesses shows there was no production or drainage from the Upper Pettit at that location. Contrary to the statement in the dissenting opinion, there was no evidence of any act or omission by Arkla that would constitute "poor conservation practices," except Smith's unsupported assumption that Arkla had produced or drained the Upper Pettit.

Smith asserted that Arkla did not cement the Upper Pettit until it completed its Cromer 2–C well. That is no evidence of negligence. There is no reason or need to cement off a formation until it or another formation has been perforated, and the Cromer 2–C well was not perforated until it was completed.

Smith's assumptions, based on cryptic comments in some correspondence and records, that Arkla knew of alleged "communi-

cation" between the Upper Pettit and Lower Pettit sands is refuted by the direct evidence from the Railroad Commission and by testimony from Arkla's two expert witnesses, Robertson and Gaston.

As the Railroad Commission's fact findings show specifically that Arkla did not violate any rule or drain or produce the Upper Pettit at all, and that evidence is directly corroborated by Arkla's expert testimony, a finding that Arkla was negligent is against the great weight and preponderance of the evidence.

There is another reason why the judgment cannot stand. Even if Arkla had produced from the Upper Pettit, under the rule of capture it had the absolute right to do so unless it violated the Railroad Commission's rules or its manner of production was negligent or reckless and resulted in drainage to adjacent owners.

In *Elliff v. Texon Drilling Co., supra,* a case on which appellees rely, the Supreme Court explained the rule of capture:

It must be conceded that under the law of capture there is no liability for reasonable and legitimate drainage from the common pool. The landowner is privileged to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate *all the oil and gas that he may produce,* so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission.

(Emphasis added.) *See also Halbouty v. Texas Railroad Commission,* 163 Tex. 417, 357 S.W.2d 364, *cert. denied,* 371 U.S. 888, 83 S.Ct. 185, 9 L.Ed.2d 122 (1962); *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 83 S.W.2d 935 (1935); *Stephens County v. Mid–Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290 (1923); 55 Tex.Jur.3d *Oil and Gas* § 13, at 39–41 (1987); 1 W.L. Summers, The Law of Oil and Gas § 63 (1954); 1 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 4.2, at 115–18 (1987).

An owner may also produce and appropriate the hydrocarbons underlying his land, even though by doing so he reduces the pressure from the strata underlying his neighbor's land, so long as he does not do so

in a negligent, reckless, or illegal manner. *United Carbon Co. v. Campbellsville Gas Co.,* 230 Ky. 275, 18 S.W.2d 1110 (1929); 1 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 4.2, at 117 (1987); *see also Houston & T.C. Ry. Co. v. East,* 98 Tex. 146, 81 S.W. 279 (1904). Unless it violates some statute or rule, an owner's production from his own property does not constitute waste of a common stratum, even though the resulting drainage lessens the profits or value of adjoining property. *See Tanner v. Olds,* 29 Cal.2d 110, 173 P.2d 6, 167 A.L.R. 1219 (1946).

Appellees argue that the rule of capture does not apply here because it applies only when there is *production* from a common pool. The correctness of that statement depends on the definition of common pool. Common pool does not mean a formation from which more than one party is producing; it simply means a formation or reservoir that lies under more than one tract. The rule of capture applies when separate tracts are above *a common source of supply.* *Halbouty v. Texas Railroad Commission, supra;* 1 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 4.3, at 119 (1987). It is not required that there be production from both tracts; if it were, an operator could never produce from a formation unless another was already producing from it. It is undisputed that the Upper Pettit formation extends under both tracts of land involved in this case.

Since Arkla had an absolute right to produce from the Upper Pettit unless it violated Railroad Commission rules or was negligent, and since the overwhelming evidence shows that it did nothing illegal or negligent, the jury's finding of negligence is against the great weight and preponderance of the evidence.

BLEIL, Justice, dissenting.

Does this tort suit, filed two and one half years before the Railroad Commission responded to Arkla's request by finding that Arkla did not violate Commission rules, constitute a collateral attack on an order of the Commission? Not in my view.

The appellees plead and present their case on alternative grounds, claiming that Arkla's

wrongful conduct was negligent, intentional or illegal. The verdict and judgment are premised solely on negligence. A petroleum engineer testified that Arkla's negligent conduct damaged appellees. Evidence showed that Arkla was negligent in allowing the communication of fluid from one reservoir to another, in using poor conservation practices, and in failing to take corrective measures when it learned that it was improperly reducing the gas pressure in the Upper Pettit reservoir while drilling in the Lower Pettit and Travis Peak reservoirs.

Evidence supported the jury's answers to questions concerning *negligence, proximate cause,* and *damages.* The Railroad Commission does not have jurisdiction over tort claims between the parties to this suit; it did not purport to make any such determinations. It made no order relating to *negligence, proximate cause,* or *damages.* The case was properly before the district court because the Railroad Commission has no authority to determine the answers to these questions. *See Amarillo Oil v. Energy–Agri Products,* 794 S.W.2d 20, 26 (Tex.1990); *Foree v. Crown Central Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968).

The majority holds that appellees' negligence cause of action is barred as an impermissible collateral attack on the Railroad Commission's findings that Arkla's operations did not violate the Commission's rules. Actionable negligence does not require that the act or omission complained of should involve any element of illegality. *Hommel v. Southwestern Greyhound Lines,* 195 S.W.2d 803, 808 (Tex.Civ.App.—Fort Worth 1946, no writ). Consequently, a defendant cannot avoid a charge of negligence merely by showing that the act or omission complained of was not violative of any statute or ordinance. *Id.* However, this is precisely what the majority is allowing Arkla to do.

A cause of action for negligent waste exists separate and apart from the rules of the Railroad Commission. *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 563 (1948). The law imposes upon all persons the duty to exercise ordinary care when conducting one's business or in the use and exploitation of one's property to avoid dam-

aging the property of others. *Id.* Thus, under the common law, *independent of any statute,* one drilling and operating an oil or gas well is legally bound to use due care to avoid the negligent waste or destruction of the minerals in the oil- and gas-bearing strata under his land and that of his neighbors. *Id.*

Furthermore, the Texas Natural Resources Code does not preclude the possibility of a common law negligence action based on grounds other than violations of the state laws or the rules and orders of the Railroad Commission. Although the Natural Resources Code recognizes that violations of its conservation provisions or the rules of the Commission can form the basis for recovering actual damages in a civil suit, the Code does not limit a suit for damages solely to such violations. TEX.NAT.RES.CODE ANN. § 85.321 (Vernon 1993). Section 85.321 has a proviso that states:

> Provided, however, that in any action brought under this section *or otherwise,* alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances. *Id.*

(Emphasis added.) This section both acknowledges that a civil suit may be brought on grounds beyond those specified in the section and establishes the defense of the "reasonably prudent operator" standard that is akin to the "reasonably prudent person" standard found in a common law negligence action.

This tort suit is much less of a collateral attack upon the Commission's order than was the suit to determine the ownership of gas in *Amarillo Oil v. Energy–Agri Products,* 794 S.W.2d 20. This tort suit is much like that in *Bolton v. Coats,* 533 S.W.2d 914 (Tex.1975). There it was held that a suit for damages for drainage of oil by wells on adjacent leases was not an impermissible collateral attack on the Railroad Commission's order. 533 S.W.2d at 916.

Additionally, this suit is not a collateral attack on the Commission's findings because it was filed long before any Commission involvement.

A collateral attack involves a suit to set aside a preexisting judgment or order. *See* 48 TEX.JUR.3d *Judgments* § 276 (1986). This suit was filed in 1989. The Railroad Commission's findings of facts were in 1992. The majority cites cases holding that Railroad Commission orders, unless void, are immune from collateral attack. Of course, these cases all involve suits to set aside preexisting orders of the Commission.

This tort suit is not a collateral attack on the Commission's order. The majority errs in holding that it is. My review of the remaining points of error touching on a melange of legal issues persuades me that the trial court's judgment should be affirmed.